# LAWN *v.* UNITED STATES.

No. 9. Argued October 14, 1957.—Decided
January 13, 1958.

340

*Milton Pollack* argued the cause for petitioner in No. 9. With him on the brief were *Francis E. Koch, Brainerd Currie* and *Philip B. Kurland*.

*Joseph Leary Delaney* argued the cause for petitioners in No. 10. With him on the brief were *James B. Burke* and *Harold W. Wolfram*.

*Roger Fisher* argued the cause for the United States. With him on the briefs were *Solicitor General Rankin, Assistant Attorney General Rice* and *Joseph F. Goetten*.

MR. JUSTICE WHITTAKER delivered the opinion of the Court.

On July 23, 1953, a 10-count indictment was returned in the United States District Court for the Southern District of New York charging petitioners and others with evading, and conspiring to evade, assessment and payment of a large amount of federal income taxes for the year 1946 in violation of the internal revenue laws (§§ 145 (b) and 3793 (b) of the Internal Revenue Code of 1939) [1] and of the general conspiracy statute (18

---

[1] 26 U. S. C. (1952 ed.) §§ 145 (b) and 3793 (b).

The first five counts named only petitioner Giglio and Louis J. Roth as defendants. Since Giglio does not here contest the adequacy of the evidence to sustain those or any of the other counts against him, and since Roth pleaded guilty to all counts of the indictment and was a principal witness for the prosecution at the trial, those counts are not here summarized.

The remaining counts in essence charged as follows:

Count 6 charged that Livorsi and Roth, on or about September 15, 1947, willfully attempted to evade assessment of income taxes of Livorsi for the calendar year 1946 by filing a fraudulent return.

Count 7 charged that Giglio, Lawn and Roth, from about Septem-

U. S. C. § 371). After a protracted trial before a jury petitioners were found guilty as charged.[2] On appeal the Court of Appeals found that there was substantial evidence that petitioners, operating through the media of several partnerships and corporations,[3] conspired to evade, and by a variety of means did evade, both the

ber 1, 1947, to the date of filing of the indictment, willfully attempted to evade payment of Giglio's income taxes for the calendar year 1946 by concealing his assets.

Count 8 charged that Livorsi, from about September 1, 1947, to the date of filing of the indictment, willfully attempted to evade payment of his income taxes for the calendar year 1946 by concealing his assets.

Count 9 charged that Giglio, Livorsi, Lawn and Roth, from about January 1, 1946, to the date of filing of the indictment, willfully attempted to evade payment of income taxes of American Brands Corporation for the calendar year 1946 by converting and diverting its assets.

Count 10 charged that Giglio, Livorsi, Lawn, Roth and American Brands Corporation, from about July 1, 1945, to the date of filing of the indictment, willfully conspired to commit the substantive offenses charged in Counts 1 through 9 of the indictment.

Count 10 of the indictment was dismissed by the court as to American Brands Corporation after the jury failed to report as to it.

[2] Lawn was sentenced to a year and a day on each of Counts 7, 9 and 10, the sentences to run concurrently. Giglio was sentenced to a total of 15 years. Livorsi was sentenced to 5 years on each of Counts 6, 9 and 10 to run consecutively, and was sentenced to 5 years on Count 8 to run concurrently with the sentence on Count 6.

[3] The principal organizations were: Tavern Fruit Juice Company, a partnership owned by Giglio and Livorsi; Eatsum Food Products Co., Ltd., a partnership owned 25% by Giglio, 25% by Livorsi, and 50% by one Lubben until March 8, 1946, when he left the enterprise and sold his "distributive share" in the profits thereof to Giglio and Livorsi; and a series of corporations bearing in some combination the word "American" which were created in early 1946 to drain off the profits of Eatsum through the use of fraudulent invoices and were to be dissolved before their income taxes became due.

assessment [4] and the payment [5] of more than $800,000 of individual and corporate federal income taxes for the year 1946 [6] upon income derived from the World War II black market in sugar and that petitioners Giglio and Livorsi, who owned equal interests in the several enterprises of which Giglio was the chief executive, were the principals in the conspiracy, but Roth, an accountant, and Lawn, a lawyer, [7] provided the accounting and legal services required to carry out the conspiracy. It found that the evidence amply sustained the verdicts and that no prejudicial error was committed at the trial, and it affirmed the judgments of conviction. 232 F. 2d 589. Upon petition by Lawn in No. 9, and by Giglio and Livorsi in No. 10, we granted certiorari. 352 U. S. 865. Because the challenged convictions resulted from a common trial at which petitioners were represented by the same counsel, and because several of the questions presented in each case are similar, the two cases will be decided in one opinion.

Petitioners ask this Court to reverse their convictions upon four main grounds. First, they contend, Lawn only

---

[4] The Court of Appeals found that generally three means of evasion of tax assessment were used: (1) the fraudulent allocation of income among the various companies and individuals in the conspiracy; (2) the fraudulent overstatement of expenses; and (3) the failure to disclose income.

[5] The evasion of payment was in general accomplished by delaying disclosure of income tax liabilities through the filing of returns from 5 to 15 months late; by failing to withhold income taxes on salaries; by concealment of the individual assets of Giglio and Livorsi; and by the misappropriation, conversion and diversion of corporate assets.

[6] Of the total, $573,683.73 was admitted to be owing by Giglio, Livorsi and American Brands Corporation in the long-overdue returns they filed, and only $16,735.95 was paid.

[7] They were full-time employees of the several Giglio and Livorsi enterprises.

tangentially, that they were deprived of due process in violation of the Fifth Amendment by the refusal of the District Court to conduct a full-dress hearing to determine whether testimony or documents obtained from them in a prior grand jury investigation, or evidence derived from leads and clues furnished thereby, was considered by the grand jury that returned the present indictment. Second, petitioner Lawn contends that receipt in evidence at the trial of a photostatic copy of a canceled check and its corresponding check stub, obtained from him in a prior grand jury investigation, deprived him of due process in violation of the Fifth Amendment. Third, petitioners contend they were denied an opportunity to examine and cross-examine witnesses at the trial to determine whether evidence derived from leads and clues furnished by testimony and documents obtained from petitioners in a prior grand jury investigation was used by the prosecution at the trial, and that this deprived them of due process in violation of the Fifth Amendment. And fourth, petitioners Lawn and Livorsi contend that the evidence does not support their convictions.

Understanding of petitioners' first and second contentions, and to a lesser extent their third contention, requires a review of the underlying facts upon which they are based. Revenue agents began an investigation in 1948 of petitioners' income tax liabilities, and on September 14, 1950, three criminal informations were filed charging them with violation of the federal income tax laws. Those informations were not brought to trial because the Government had not completed its investigation and later concluded that "much more serious crimes [were] involved." In early July 1952, petitioners and Roth were served with subpoenas *duces tecum* commanding them to appear and testify before a grand jury on July 14, 1952, and to produce certain partnership and corporate records of the Giglio and Livorsi enterprises.

They appeared and testified, but were not warned of their constitutional privilege against self-incrimination. Lawn produced three canceled checks made by Tavern Fruit Juice Co. payable to his order and the checkbook stub corresponding to the second check. Those instruments were there marked "G. J. Ex. [1, 2, 3 and 4, respectively.] 7/15/52 L. F. G." and were photostated by the United States Attorney and returned to Lawn. Giglio produced a quantity of records, including some partnership records, but stated that "practically all of these companies and corporations turned over the books and records to the Internal Revenue Department on some date in 1949." On October 20, 1952, the grand jury returned six indictments against petitioners charging them with offenses similar to those charged in the present indictment. Petitioners moved to dismiss those indictments upon the ground that they had been procured, in part at least, upon evidence obtained from petitioners in violation of their Fifth Amendment rights. The District Court held that to require petitioners to testify and produce partnership and personal records before the grand jury, while criminal informations charging tax evasions were pending against them, without warning them of their constitutional privilege against self-incrimination, violated their Fifth Amendment rights. It therefore dismissed the indictments and directed the Government "to return, to the respective defendants, the partnership and personal records produced by them in response to the subpoenas." *United States* v. *Lawn,* 115 F. Supp. 674, 678. The Government appealed from that order but the appeal was dismissed as untimely on October 19, 1953. *United States* v. *Roth,* 208 F. 2d 467.[8] While that appeal was pending

[8] In their brief on that appeal petitioners had argued that the Government's notice of appeal was not timely filed, but they did not move to dismiss the appeal until after the period of limitations had run in late September 1953.

the Government caused a new investigation to be made of petitioners' federal income tax liabilities by another grand jury, before whom petitioners did not appear, and on July 23, 1953, that grand jury returned the present indictment which was sealed. After the Government's appeal from the order dismissing the 1952 indictment had been dismissed (*United States* v. *Roth, supra*) the new sealed indictment was opened, and soon afterward petitioners moved (1) to dismiss the indictment, and in that connection (2) to have a hearing to determine whether the Government had used testimony given or documents produced by petitioners before the 1952 grand jury, or evidence obtained through leads and clues furnished thereby, in procuring the indictment, and (3) to inspect the minutes of the grand jury and, if the motion to dismiss the indictment be denied, (4) to suppress the use at the trial of all testimony and documents procured from petitioners in the 1952 grand jury proceeding and all evidence derived therefrom. These motions were submitted to the court upon affidavits.[9] After considering them and

---

[9] In support of their motions petitioners filed a number of affidavits reciting in essence that the 1952 indictment was returned after the Government had secured testimony and documents from petitioners in violation of their constitutional rights; that the present indictment is very similar to the prior one, and that a revenue agent had implied that some of his computations were based on documents stored in a room in which the documents obtained from petitioners were also kept.

In opposition to the motions the Government filed affidavits made by all of the revenue agents who had conducted investigations leading to the indictment and by all the United States Attorneys who had been responsible for the prosecution of the case. In essence, they recited that after the District Court dismissed the 1952 indictment a conference was called, by an assistant United States Attorney, of all revenue agents who had conducted the investigations; that they were there told that it would be necessary to obtain a new indictment which was not to be based in any way, however remote, upon testimony or personal or partnership documents obtained from

hearing extensive arguments of counsel, the court found that the affidavits left no room for an inference that the Government had used illegally obtained materials in securing the present indictment, that petitioners' claim did not have the "solidity" required to justify the holding of such a hearing, and that to do so "on the basis of the showing made by the defendants and the Government would indeed be subordinating 'the need for rigorous administration of justice to undue solicitude for potential . . . disobedience of the law by the law's officers.' [*Nardone* v. *United States*, 308 U. S. 338, 342.]" *United States* v. *Giglio*, 16 F. R. D. 268, 270. The court declined to hold the requested hearing and denied the motion to inspect the grand jury minutes and the motion to dismiss the indictment. The court also denied the motion to suppress,[10] but in that connection said: "Of course, if dur-

petitioners in the 1952 grand jury proceedings, and any doubts about the use of any evidence were to be resolved in favor of exclusion; that none of the testimony or personal or partnership records, produced by petitioners before the 1952 grand jury, was in any way used in obtaining the present indictment; and that long before 1952 the Government had in its possession copies and microfilm enlargements of bank checks, bank statements and books and records pertaining to petitioners' transactions, which had been secured from banks, third persons, a New Jersey receiver, government agencies, and abandoned books and records relating to petitioners' businesses. The affidavit of the Assistant United States Attorney in charge of the case unequivocally recited that none of the materials obtained from petitioners in the 1952 grand jury proceeding would be used in the future course of the case.

[10] The court stated as its reasons: "The United States Attorney has sworn that this material will not be used in the future course of this case, and at this stage of the proceedings, that oath is sufficient. The granting of defendants' motion to suppress at this time would necessitate an investigation of all of the Government's evidence. Such an investigation would entail a great deal of useless effort because much of this material, which has been collected since 1948, will not be used at the trial." *United States* v. *Giglio*, 16 F. R. D., at 270, 271.

ing the course of the trial defendants have reason to believe that illegally obtained material is being or may be used against them, they can object at that time and it will be incumbent upon the trial judge to rule on their objections." *United States* v. *Giglio, supra,* at 271.

Pursuant to order of the court the Government produced for inspection by petitioners, before the trial, the corporate records delivered by Giglio to the 1952 grand jury in compliance with its subpoena, the documents which had been abandoned by petitioners and examined by the Government, and the documents relating to petitioners' businesses obtained from the New Jersey receiver. At the beginning of the trial petitioners renewed the above-mentioned motions which were again denied. In the course of the trial the Government furnished petitioners a transcript of their testimony before the 1952 grand jury.

## I.

As stated, petitioners first contend that they were deprived of due process by the refusal of the court to conduct the requested full-dress hearing to enable them to attempt to determine whether materials obtained from them in the 1952 grand jury proceeding, or evidence derived therefrom, was considered by the 1953 grand jury. We believe there is no merit in this contention. The District Court's order dismissing the 1952 indictments because of the use of such evidence before that grand jury, though final, could not in any way determine that any direct or derivative use of such evidence was made by the 1953 grand jury that returned the present indictment. The affidavits submitted in support of and in opposition to the motion for the requested hearing disclosed, as found by the trial court and the Court of Appeals, with which findings we agree, that petitioners had no reason, beyond suspicion, to believe that the 1953 grand jury considered

any of the materials produced by petitioners before the 1952 grand jury. These facts make clear that petitioners laid no foundation for the holding of a protracted preliminary hearing (at which they would, in effect, take the depositions of the Government's witnesses) to determine whether there was any substance to their suspicion that some direct or derivative use may have been made by the 1953 grand jury of materials produced by petitioners before the 1952 grand jury.

Moreover, this Court has several times ruled that an indictment returned by a legally constituted nonbiased grand jury, like an information drawn by a prosecutor, if valid on its face, is enough to call for a trial of the charge on the merits and satisfies the requirements of the Fifth Amendment. In *Holt* v. *United States,* 218 U. S. 245, this Court was required to decide whether an indictment should be quashed because procured in part by incompetent evidence of an admission by the accused, aside from which "there was very little evidence against the accused." *Id.,* at 247. This Court refused to hold that such an indictment should be quashed, stating: "The abuses of criminal practice would be enhanced if indictments could be upset on such a ground." *Id.,* at 248. In *Costello* v. *United States,* 350 U. S. 359, this Court squarely faced and decided the question, saying:

"If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. An indictment returned by a legally constituted and unbiased

grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more." *Id.,* at 363.

This Court was urged in that case to "establish a rule permitting defendants to challenge indictments on the ground that they are not supported by adequate or competent evidence," *id.,* at 364, but the Court declined to do so, saying:

"It would run counter to the whole history of the grand jury institution, in which laymen conduct their inquiries unfettered by technical rules. Neither justice nor the concept of a fair trial requires such a change. In a trial on the merits, defendants are entitled to a strict observance of all the rules designed to bring about a fair verdict. Defendants are not entitled, however, to a rule which would result in interminable delay but add nothing to the assurance of a fair trial." *Ibid.*

It should be unnecessary to say that we are not here dealing with the use of incompetent or illegal evidence in a trial on the merits, nor with the right to decline to give incriminating testimony in legal proceedings or to suppress the direct or derivative use at the trial of evidence illegally obtained. We deal here only with the question whether petitioners, in the circumstances of this case, were entitled to a·preliminary hearing to enable them to satisfy their unsupported suspicions that the 1953 grand jury that returned this indictment made direct or derivative use of the materials which they produced before the 1952 grand jury. We hold that they were not.

## II.

We come now to petitioner Lawn's contention that receipt in evidence at the trial of a photostatic copy of a

canceled check and its corresponding check stub, obtained from him in the 1952 grand jury proceeding, deprived him of due process in violation of the Fifth Amendment. As earlier stated, Lawn, pursuant to subpoena, produced before the 1952 grand jury a canceled check of Tavern Fruit Juice Co. payable to his order in the amount of $15,000, endorsed by him, and the corresponding stub, which were marked on their faces "G. J. Ex. 2 7/15/52 L. F. G." and "G. J. Ex. 4 7/15/52 L. F. G.," respectively, and were photostated by the United States Attorney and returned to Lawn. Those photostats were offered in evidence—it appears inadvertently—by the prosecution at the trial, as Exhibits 61–A and 61–B. However, before those exhibits were offered, Exhibit 58–A, being a statement of assets, liabilities, income, profit and loss and supporting schedules of Tavern Fruit Juice Company prepared some time after Tavern's fiscal year had ended on March 31, 1946, and Exhibit 7, being Tavern's information tax return for 1946 which was filed on September 15, 1947, had been received in evidence without objection. The former contained an item of "legal expenses $16,600," while the latter recited "legal fees $1,600." Roth, in explanation, testified that "sometime during the operation of the partnership a check for $15,000 was drawn to Howard Lawn," and that a question had arisen about how to enter it on the books. After discussing the matter with Giglio, Roth charged it to legal expense. Months later Lawn asked Roth how the item was carried on Tavern's books and Roth told him that it was carried as a legal expense. Lawn advised Roth that this handling was incorrect, as the item was a loan from Giglio and not a legal expense of Tavern. Thereupon, after consulting Giglio, Roth altered Tavern's books by removing the item from legal expense and charging it to Giglio. Roth did not remember just when the alteration of the

books was made, except that it was after the preparation of Exhibit 58–A and prior to the filing of Exhibit 7.

It is important to note that at this stage of the trial there was thus clear evidence before the jury, corroborated by Exhibits 58–A and 7, all admitted without objection, showing that Lawn had received the $15,000 check from Tavern, but an issue existed whether it was an innocent loan from Giglio or an incriminatory payment by Tavern in the guise of a legal fee. The prosecution then offered in evidence Exhibits 61–A and 61–B, being the $15,000 check and corresponding stub. Petitioners' able and experienced counsel (now deceased) then asked, and was granted, permission to examine the witness Roth preparatory to a possible objection to those exhibits. He then questioned the witness at some length about the handwriting on the check and stub,[11] and concluded by asking the witness: "Q. And under that check stub or in that No. 640 [the number of the check stub], which corresponds with the check itself, there is a parenthetical statement, 'Bill G'? A. Yes, sir. Q. Indicating it is for

---

[11] "Q. In whose handwriting are the entries on Government's Exhibit 61–B for identification? I think you said it is the stub book. A. To the best of my recollection, those are Mr. Cerone's.

"Q. How do you spell Cerone? A. C-e-r-o-n-e.

"Q. He was one of your employees, Mr. Roth? A. No, he was a bookkeeper employed by Tavern Fruit Juice.

"Q. Would the same be true with regard to the check, the face of the check, payee of the check? A. The payee of the check and the amount?

"Q. The handwriting is what I am asking about. A. The handwriting, that looks like William Giglio's handwriting.

"Q. The maker of the check [for] the $15,000? A. Yes, the signature.

"Q. They look like his handwriting, do they? A. Yes, sir.

"Q. And this 61–B for identification, you have told me that that looked like the printing or the writing of Mr. Cerone, did you not? A. Yes, sir."

Mr. Giglio's account? A. Yes, sir." And petitioners' counsel then stated, "No objection," and the exhibits were received. This examination and use of those exhibits (showing on their face that they had been exhibits before the 1952 grand jury) by petitioners' able counsel to show that the check was an innocent loan by Giglio and not an incriminatory payment by Tavern in the guise of a legal fee—his only opportunity to drive that point home to the jury if petitioners were not to take the stand, as they did not—and his affirmative statement that he had "no objection" to receipt of the exhibits show, we believe, a conscious and intentional waiver of all objections to receipt of those documents in evidence.

Lawn argues that the denial, before the trial, of petitioners' motion to suppress, and the unequivocal affidavit of the United States Attorney in charge of the case stating that materials obtained from petitioners pursuant to subpoena in the 1952 grand jury proceeding would not be used in the future course of the case, preserved his objections to these exhibits and made it unnecessary again to object to them at the trial. It is quite true generally that the overruling of a pretrial motion to suppress the use at the trial of particular evidence preserves the point and renders it unnecessary again to object when such evidence is offered at the trial. *Cogen* v. *United States,* 278 U. S. 221, 223; *Gouled* v. *United States,* 255 U. S. 298, 312, 313; *Waldron* v. *United States,* 95 U. S. App. D. C. 66, 69–70, 219 F. 2d 37, 41; and compare *Keen* v. *Overseas Tankship Corp.,* 194 F. 2d 515. But the rule is one of practice and is not without exceptions, nor is it to be applied as a hard-and-fast formula to every case regardless of its special circumstances. *Cogen* v. *United States, supra,* at 223, 224; *Gouled* v. *United States, supra,* at 312, 313. It will be remembered that the court in passing on the motion to suppress said, respect-

ing the affidavit of the United States Attorney, that "at this stage of the proceedings that oath is sufficient" (*United States* v. *Giglio,* 16 F. R. D., at 271), but he expressly left the matter of suppression of evidence to the trial court and admonished petitioners that if during the course of the trial they "have reason to believe that illegally obtained material is being or may be used against them, they can object at that time and it will be incumbent upon the trial judge to rule on their objections." *Id.,* at 271. The record shows that petitioners' counsel was fully aware of all this when Exhibits 61–A and 61–B were offered in evidence, and when, after using them for his purposes, he affirmatively said he had "no objection" to them.

The Government argues that, had its attention been called to the fact that these particular photostatic copies had been exhibits before the 1952 grand jury by an objection to them, it could and would have produced other copies obtained from other sources before the 1952 grand jury proceeding was commenced. In that connection it has filed here what is said to be a transcript of a hearing accorded to Lawn at his request on May 12, 1952, which it says contains photostatic copies of the check and check stub in question voluntarily produced by Lawn. Lawn has moved to strike that transcript and the portions of the Government's brief relating thereto. That motion must be sustained as we must look only to the certified record in deciding questions presented. *McClellan* v. *Carland,* 217 U. S. 268.

We believe that the facts from the certified record, above discussed, show that petitioners' counsel, after using the check and check stub to make his point before the jury that the check was an innocent loan from Giglio and not an incriminatory payment by Tavern in the guise of a legal fee, wisely (as, we believe, every impartial and experienced trial lawyer would agree) said that he had

"no objection" to those exhibits, and thus consciously and intentionally waived any objection to their receipt in evidence.

### III.

Petitioners argue that they were denied an opportunity to examine and cross-examine witnesses at the trial to determine whether evidence derived from leads and clues furnished by materials obtained from them in the 1952 grand jury proceedings was used by the prosecution at the trial, and that this deprived them of due process in violation of the Fifth Amendment. It cannot be doubted that petitioners had that right in the circumstances of this case, *Nardone* v. *United States,* 308 U. S. 338, 341, 342, and the Government does not otherwise contend. Moreover, as earlier stated, the District Court, in ruling the pretrial motion to suppress, expressly left this subject open to inquiry at the trial. *United States* v. *Giglio,* 16 F. R. D., at 271. The contention is wholly factual, and a thorough study of the record discloses that petitioners were accorded that right. The court did not sustain objections to petitioners' examination or cross-examination of witnesses attempting to show derivative use at the trial of any evidence produced by petitioners before the 1952 grand jury, but only sustained objections to questions attacking the procedural validity of the indictment.[12] At no time did counsel for petitioners point

---

[12] Though at times, in colloquies with the court, counsel for petitioners was equivocal, the following is typical of the position taken by him:

Counsel: "I really don't see how I can get adjudicated the question of the illegality of the indictment before you without calling all these people who made affidavits before Judge Palmieri. Now, that obviously would be, well, very disruptive of your trial. I would never think of doing it if . . . it didn't seem to me that was all I had. . . . Have I made it plain?

"The Court: I think you have, but I want to be sure. Now, the

specifically to any evidence offered at the trial which they claimed was derived from materials furnished by petitioners before the 1952 grand jury. Near the close of the Government's case, the court stated that, so far as he could detect, there had been no direct or derivative use of any tainted evidence by the Government at the trial, and he requested counsel for petitioners, on two occasions, to submit a memorandum of any evidence offered by the Government which he believed was obtained through leads or clues from materials produced by petitioners before the 1952 grand jury. No such memorandum was ever furnished.

Petitioners point to three instances where they say the trial court denied them the right to examine witnesses about the source of evidence offered by the Government at the trial. First, they say that in cross-examining the Government's witness Roth they sought to question him concerning an affidavit he had made in support of the motion to dismiss the 1953 indictment, but the court sustained an objection to the question. It is clear that the ruling was made upon the ground, as petitioners' counsel stated at the time, that the purpose of the interrogation was to "go into the question of what evidence was used to obtain this indictment," rather than to show the use by the Government of tainted evidence at the trial. Second, they point to the fact that during the cross-

whole purpose of this is to go to the procedural validity of the indictment."

Counsel: "That is it, yes, sir. That is it, that is just it exactly.

"The Court: And it is a question, really, of what happened before the grand jury."

Counsel: "That's it, really, just that.

"The Court: Rather than its effect upon what you might call the substantive issues of the case or the guilt or innocence of these defendants, let us say."

Counsel: "My answer is an unequivocal yes, and I don't have to look at a record to answer it."

examination of Treasury Agent Present, their counsel asked him whether, in his audits, he had examined any other books or records about which counsel had failed to ask; and they argue that the purpose of the question was to determine whether tainted evidence had been or was being used by the Government at the trial, and that they were denied an answer to the question. But examination of the record discloses that counsel's announced purpose in asking the question was not to determine whether tainted evidence had been or was being used at the trial, but was, rather, to determine whether tainted evidence was "used by the grand jury that found this indictment." [13] Third, petitioners argue that in examining their own witness, former Assistant United States Attorney Leone, they were denied an opportunity to show

---

[13] The record shows that, although there was no objection to the question, counsel for the Government stated to the court, out of the hearing of the jury, that prior to the dismissal of the 1952 indictment the witness had examined partnership records produced by petitioners before the 1952 grand jury, and said: "If counsel elicits testimony now about those facts, there is going to be before this court evidence which Judge Goddard held improper. . . . If counsel wishes to examine into this field I think he should do it outside the presence of the jury, because it might be prejudicial error even if he voluntarily does it." Counsel for petitioners then made plain that his purpose was to determine whether tainted evidence was "used by the grand jury that found this indictment," and he further said, "I have no other way . . . than to do it here." Counsel for the Government then said to the court: "Now, the question specifically presented to the witness was broad and includes partnership records illegally produced and partnership records legally obtained. There can't be objection to the second part, but the question is too broad." Counsel for petitioners replied: "Well, I am not going into something half-way. . . ." The court then said: "All right, I think that is the way I should rule." It is obvious that none of this constitutes any support for petitioners' claim that they were denied an opportunity to cross-examine the witness to determine whether tainted evidence had been or was being used by the Government at the trial.

derivative use of tainted evidence by the Government at the trial. The record shows that there is no basis whatever for this contention.[14]

## IV.

Petitioners Lawn and Livorsi argue that the evidence is insufficient to sustain their convictions. In support of Count 10, the conspiracy count, the record contains evidence tending to show that Lawn, formerly Chief of the Criminal Division of the United States Attorney's Office for the District of New Jersey, was employed by Giglio and Livorsi because "he had a terrific entry with some of the highest government offices," "was a part of the organization" and was "there to prevent any trouble." He was frequently in Giglio's private office, which adjoined his own. Lawn was present in Giglio's office when it was decided that Eatsum would purchase corn at black-market prices and have it refined into syrup to be sold for over-ceiling prices, and Lubben began the handling of those matters. But Lawn later told him that he "had terrific connections" with a syrup company and with a prominent political figure in the midwest and that he could procure the corn and syrup more advantageously, and Lawn then took over the handling of those matters. Lubben was called into Giglio's office in September 1945, where Giglio, Roth and Lawn were present, and Giglio stated "that the profits from [Tavern's] candy business and primarily [Eatsum's] corn syrup business were becoming terrific, and that he wasn't interested in paying a lot of income tax and something had to be done, and done quick"; that "it had been decided to form a num-

---

[14] In fact, all petitioners sought to show by this witness was that when he caused petitioners to be subpoenaed to appear before the 1952 grand jury he knew that criminal informations charging tax evasions were then pending against them, and that these prosecutions were instituted in "bad faith."

ber of companies" to siphon off the profits of the partnerships through "phony invoices"; and that the companies would "be dissolved . . . before it came time to pay the income tax." Soon afterward Lawn was instrumental in the creation of a number of corporations bearing in some combination the word "American." Lawn was an officer and nominal stockholder in several of these corporations, and owned 25% of the stock of one of them which had been given to him by Giglio and Livorsi, and Lawn received substantial payments from the Giglio and Livorsi enterprises in addition to his salary. In September 1947, near the time the delinquent income tax returns were filed for the year 1946 by Giglio, Livorsi and their several corporations, a meeting was held in Lawn's private office with Giglio and Roth where it was agreed that Giglio would transfer his home to Roth so that the Government would "not be able to take the house," and Lawn said the arrangement "would save Mr. Giglio's home." Soon afterward the transfer was made. There was other evidence tending to show Lawn's participation in the conspiracy, but we believe the above-recited evidence, with the legitimate inferences that might be drawn therefrom by the jury, was clearly sufficient to support the verdict on the conspiracy count.

Lawn also contests the sufficiency of the evidence to support the verdicts against him on Counts 7 and 9, but since the sentences upon those counts run concurrently with the sentence on Count 10, which we have found sustained by the evidence, it is unnecessary for us to consider those contentions. *Sinclair* v. *United States,* 279 U. S. 263, 299; *Hirabayashi* v. *United States,* 320 U. S. 81; *Pinkerton* v. *United States,* 328 U. S. 640.[15]

---

[15] Petitioner Lawn also contends that a statement made by the Government's attorney in his closing summation to the jury, saying, in pertinent part, "We vouch for [Roth and Lubben] because we

Petitioner Livorsi argues that the evidence was not sufficient to support the verdicts against him. As to Count 6, which charged him with attempting to evade assessment of his income taxes for the year 1946 by filing a fraudulent return, the record shows that his return disclosed income from Eatsum for that year of $101,123.88. However, the Government introduced evidence showing that his income from that source in that year was $228,288.58, and that his income from Tavern for that year was understated by more than $40,000. During the trial an issue arose concerning the proper "distributive

think they are telling the truth," deprived him of a fair trial. No objection was made to the statement at the trial. The Government's attorney did not say nor insinuate that the statement was based on personal knowledge or on anything other than the testimony of those witnesses given before the jury, and therefore it was not improper. Cf. *Henderson* v. *United States*, 218 F. 2d 14, 19; *United States* v. *Holt*, 108 F. 2d 365, 370; *Tuckerman* v. *United States*, 291 F. 958, 969. Moreover, petitioners' counsel in his summation to the jury had argued that the Government's case was a persecution of petitioners, had been instituted in bad faith at the instance of a group of revenue agents, and was supported "solely" by the testimony of Roth and Lubben who were admitted perjurers, and counsel in his opening statement had said that the United States Attorney and his assistant in charge of the case "had been instructed, or in my opinion they never would have done this." These comments clearly invited the reply which petitioner Lawn now attacks. Cf. *Gridley* v. *United States*, 44 F. 2d 716, 739; *United States* v. *Battiato*, 204 F. 2d 717. In addition, the court in his charge to the jury, after telling them that they were the sole judges of the credibility of the witnesses, called particular attention to the fact that Roth was an accomplice and said: "You have got to be particularly careful in scrutinizing his testimony to see whether to save his own skin he lied to hurt somebody else or whether he had some other motive for lying to hurt somebody else." As to Lubben, the charge continued: "I am going to tell you to be just as careful with his testimony as you would with an accomplice, and look and scrutinize it carefully." We think the foregoing shows clearly that there is no merit in Lawn's contention.

shares" of Giglio and Livorsi in the profits of Eatsum for
the year 1946, by reason of the sale by Lubben of his "dis-
tributive share" in the profits of that partnership to Giglio
and Livorsi (on March 8, 1946) prior to the close of its
accounting year on May 31, 1946. Because of that com-
plication the court, in an effort to simplify the matter,
gave a supplemental charge to the jury in which, among
other things, he said: "[W]hen you get to counts 5 and 6,
*where it was claimed that the income received from
Eatsum wasn't fully reported* by the defendant Giglio and
by the defendant Livorsi, in connection with their indi-
vidual returns, I say because of that distributive share
difficulty, don't consider Eatsum at all . . . ." (Emphasis
supplied.) Livorsi now contends that the effect of that
charge was to eliminate the $101,123.88 of income which
he had reported in his sworn return as received from that
source in that year and to give him a credit in that amount
which more than offset his understatement of income from
other sources, and, thus, established that there was no
deficiency in his reporting of income. This contention
need not detain us long. While, of course, a conviction
upon a charge of attempting to evade assessment of
income taxes by the filing of a fraudulent return cannot
stand in the absence of proof of a deficiency, the court's
charge did not create the credit claimed by Livorsi. It
only withdrew from the jury's consideration the Govern-
ment's claim that his income from Eatsum in that year
was $127,164.70 more than he had reported in his return.
That meaning of the charge could not have been
misunderstood by the jury.

Count 9 charged Livorsi and others with attempting to
evade payment of income taxes of American Brands Cor-
poration for the calendar year 1946 by converting and
diverting its assets. Livorsi argues that there is no evi-
dence to support his conviction on that count. We must
disagree. The evidence disclosed that Livorsi owned half

of the capital stock of that corporation and frequently conferred with Giglio, who owned the other half of its capital stock, concerning the operations of the corporation and was familiar with its affairs; that no income tax was withheld by the corporation from his salary; and that from January 1, 1946, to June 16, 1947, he withdrew from the corporation more than $122,000, including salary, while the corporation had a federal income tax liability for the year 1946 of more than $100,000, as shown by its own return, of which only $300 had been paid. This evidence, with the legitimate inferences that might be drawn therefrom by the jury, was clearly sufficient to support the verdict on Count 9.

Livorsi's contention that there was not sufficient evidence to support the verdict against him on Count 10, the conspiracy count, when viewed in the light of all the foregoing facts, and those found by the Court of Appeals, which we find are supported by the record, is entirely without merit.

Livorsi also contends that the evidence was not sufficient to support the verdict against him on Count 8, but since the sentence on that count runs concurrently with the sentence on Count 6, which we have affirmed, it is unnecessary to consider his contentions concerning Count 8. *Sinclair* v. *United States, supra; Hirabayashi* v. *United States, supra;* and *Pinkerton* v. *United States, supra.*[16]

---

[16] Petitioners Giglio and Livorsi contend that the trial court erred in refusing their motion, made after several days of cross-examination of Lubben at the trial, for production of Lubben's federal income tax return for 1946, all testimony given by Lubben "before the grand jury that found this indictment or found any other indictment against these defendants," and all written statements made by Lubben to any agent of the Government. This issue was not raised in the Court of Appeals. Only in exceptional cases will this Court review a question not raised in the court below. *Duignan* v. *United States,*

Several other points raised by petitioners have been carefully considered and are found to be without merit. The judgment in each case must be

*Affirmed.*

MR. JUSTICE HARLAN, whom MR. JUSTICE FRANK- FURTER and MR. JUSTICE BRENNAN join, concurring in part and dissenting in part.

I agree with all of the Court's opinion except Part II relating to Government exhibits 61–A and 61–B, which are the copies of the canceled check and stub evidencing the $15,000 payment to Lawn. This leads me to concur in the affirmance of the convictions of Giglio and Livorsi, but as to Lawn I think a different result is required.

The Court appears to recognize that these exhibits were excludable as "tainted" evidence, since they were government-made copies of documents which, as held in a prior decision, *United States* v. *Lawn,* 115 F. Supp. 674, had been obtained from Lawn in violation of his consti- tutional rights. Nevertheless the Court sustains their admissibility on the ground that Lawn's counsel "con- sciously and intentionally" waived at trial any objection to them. This view I cannot share, for it seems to me the Court's action falls short of what we should do in holding the Government to the strictest measure of account- ability on its repeated representations to court and defense counsel that it was not using any "tainted" evi- dence at the trial.

274 U. S. 195, 200; *Husty* v. *United States,* 282 U. S. 694, 701, 702. There are no exceptional circumstances here. Cf. *United Brotherhood of Carpenters* v. *United States,* 330 U. S. 395, 412. Moreover, the question was not mentioned in the petition for certiorari filed in this Court. Our Rule 23 (1)(c) provides, in pertinent part: "Only the questions set forth in the petition or fairly comprised therein will be considered by the court." The question is not properly here. Cf. *Irvine* v. *California,* 347 U. S. 128, 129.

The Court justifies its finding of waiver by reasoning that the "no objection" remark of Lawn's counsel at the time these exhibits were introduced reflected his deliberate choice between having these documents in, or securing their exclusion from, the case. But to me this reasoning is quite unconvincing. At the outset, it should be noted that the Court here assumes that counsel realized these particular photostats of the original check and stub were "tainted" copies. That, in my opinion, is a hazardous assumption. It is true that each exhibit bore the tell-tale 1952 grand jury markings, but assuming, as I do, that the Government's use of these documents was the result of inadvertence, it is equally true that this red light escaped the notice of the prosecutor as well as that of the trial judge, who the record shows was constantly alert and sensitive throughout the trial to the possibility of "tainted" evidence filtering into the case. I see no reason for attributing to defense counsel greater awareness on this score than that possessed by the prosecutor and the judge.

Further, it is by no means as apparent to me as it is to the Court that counsel wanted these exhibits in the case for the purpose of corroborating Lawn's explanation of the $15,000 payment as being an innocent personal loan from Giglio rather than, as claimed by the Government, an incriminatory payment from the partnership.[1] As I

---

[1] It is difficult to believe that counsel could have found in these exhibits the important corroborative value which the Court now attributes to them. The original recording of the $15,000 payment as "legal expense" on Tavern's books had been made by the company accountant only after he had consulted Giglio, and there is no dispute that the subsequent alteration in this entry to reflect the payment as a transaction involving Giglio personally rather than the partnership was urged by Lawn. Only because of Lawn's insistence did the $15,000 "payment" take on its subsequent guise as a loan from Giglio.

read the record on this episode, it seems just as reasonable to suppose that counsel's *voir dire* examination of the witness through whom these exhibits were introduced, ending with his "no objection" remark, was but the familiar kind of jury play which a good trial lawyer sometimes uses to affect an appearance of unconcern towards damaging evidence which he knows he cannot keep out of the case. It is of interest that defense counsel did not even mention the loan theory in his summation; this tends to show that, having done what he could with these exhibits at the time of their receipt in evidence, his tactics were to leave well enough alone. On the other hand, it can hardly be denied that from a jury's standpoint the actual canceled check bearing Lawn's endorsement was of great value to the Government. In a jury's eyes the canceled check would be apt to be considered an instrument of crime implicating Lawn in the conspiracy, and so indeed the prosecutor played it up with telling effect in his summation.

In short, I think the Court has viewed this episode in an unreal light. At least there is much room for doubt as to what counsel actually intended. Where, as here, we are dealing with exhibits whose use the Government can justify at all only on a plea of good-faith inadvertence, I think the petitioner is entitled to the benefit of that doubt, particularly in view of the Government's repeated unequivocal representations that it would not use any of the "tainted" evidence at the trial. The Court's contrary view I deem inconsistent with the high standards which past decisions have insisted be maintained in the conduct of federal criminal trials. See *McNabb* v. *United States,* 318 U. S. 332, 340–341. "The dignity of the United States Government will not permit the conviction of any person on tainted testimony." *Mesarosh* v. *United States,* 352 U. S. 1, 9.

In my opinion the admission of these exhibits was prejudicial error, and if nothing further appeared I think we would be required to reverse for a new trial. However, additional evidence now proffered by the Government indicates that other "innocent" copies of the same check and stub were in the hands of the New Jersey federal authorities at the time of the New York trial.[2] Had the existence of such copies been known to the New York prosecutor, the error arising from the use of the "tainted" copies should be deemed harmless, for if objection to these exhibits had been made the prosecutor could have substituted "innocent" copies. If, on the other hand, the federal authorities in New Jersey had no such copies or if in any event the New York prosecutor was unaware of their possession of the copies, reversal would still be required on grounds of prejudicial error, since the prosecutor would not have been in a position to substitute "innocent" copies had the "tainted" copies been objected to and excluded at the trial.

Although, as the Court properly holds, we cannot pass upon the accuracy of this additional evidence in determining the issues before us, I think the Government's proffer may properly be taken into account in deciding the nature of the judgment we should enter. See 28 U. S. C. § 2106; cf. *United States* v. *Shotwell Manufacturing Co.,* 355 U. S. 233. The petitioner, by making his specific objection to admission of the disputed exhibits for the first time on appeal, gave the Government no occasion to introduce the "innocent" copies at the trial and thereby avoid error. He should not now be permitted to preclude the Government from showing that the error complained of was harmless.

---

[2] The Government asserts that such copies were voluntarily produced by Lawn at a hearing with reference to his own income tax returns which was held in New Jersey on May 12, 1952.

In these circumstances I think the proper course for us is to vacate the judgment of the Court of Appeals as to Lawn, and to remand the case to the District Court for the purpose of determining whether "innocent" copies of these exhibits were within reach of the New York prosecutor at the time of trial. If the court so finds, it should be instructed to let Lawn's conviction stand, and if it finds otherwise, to grant him a new trial.