Joseph N. D'ARGENTO and James A. Caparusso, Appellants,

v.

UNITED STATES of America, Appellee.

No. 19459.

United States Court of Appeals
Ninth Circuit.

Nov. 4, 1965.

Burton Marks, Beverly Hills, Cal., for appellants.

Manual L. Real, U. S. Atty., John K. Van de Kamp, Asst. U. S. Atty., Chief, Crim. Sec., J. Brin Schulman, Asst. U. S. Atty., Asst. Chief, Crim. Sec., Robt. H. Filsinger, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before BARNES and KOELSCH, Circuit Judges, and POWELL, District Judge.

POWELL, District Judge.

Joseph N. D'Argento appeals from his convictions and three concurrent five year sentences. He and James A. Caparusso were charged in a four count indictment on March 25, 1964, with violation of 18 U.S.C. 371 (Conspiracy), and 18 U.S.C. 659 (Theft from interstate shipment and possession of stolen goods). Defendants were found guilty on the three counts by the jury on April 17, 1964. The fourth count was dismissed.

Since the trial James A. Caparusso has died. His appeal is subject to dismissal as the prosecution abates on the death of the defendant. Daniel v. United States, 268 F.2d 849 (5 Cir. 1959); Crooker v. United States, 325 F. 2d 318 (8 Cir. 1963). The evidence will be discussed here as though the appeal was by both convicted defendants.

On this appeal error is claimed by appellant as follows:

1. That the evidence was insufficient to sustain a finding of guilty on any of the three counts as there was no evidence that the goods were removed from Interstate Commerce, that there was no evidence of knowledge or intent and no evidence of agreement.

2. That prejudicial and inadmissible evidence was received over objection and consisted of:

(a) Evidence of the arrest and "flight" of the defendant D'Argento in Chicago,

(b) Evidence of statement of D'Argento of ownership of an automobile on May 1, 1963, and

(c) Evidence obtained in violation of Fourth Amendment rights consisting of (1) license plates seized in Chicago, and (2) the statements of D'Argento of May 1, 1963 which were the result of an unlawful arrest.

3. That defendants were denied an opportunity to present evidence that the evidence admitted at the trial was unlaw-

fully seized, (1) as to the search warrant in Chicago, and (2) the arrest in Beverly Hills on May 1, 1963.

4. That the indictment was defective in alleging the theft and possession of the same goods and the Government should have been required to elect on which they were proceeding, and the court erred in failing to instruct the jury they could not find defendant guilty of both.

5. The cumulative effect of the erroneous admission of prejudicial evidence and the failure of the trial court to exclude the witnesses at the time of trial was such as to deny appellant due process.

At the commencement of the trial the parties entered into a written stipulation about the ownership and description of the property involved in this case. It is summarized as follows:

Twenty-seven fur pieces were shipped from New York, N. Y. by Samuel Feldstein to himself, in care of Dicker & Dicker, Beverly Hills, California. They were in two sample cases bearing Railway Express Agency (REA) waybill Nos. 790557 and 790558, and a cardboard carton bearing REA waybill No. 790559. They arrived at the REA Air Express Terminal Office at Los Angeles International Airport on November 17, 1963. The stipulation listed the style and identification numbers of the twenty-seven fur pieces.

Two additional fur pieces were shipped from New York, N. Y., by Oliver Gintel to Duffy Edwards, 201 South Beverly Drive, Beverly Hills, California, in a carton bearing waybill No. 469586, which arrived at the REA Air Express Terminal at Los Angeles International Airport on November 17, 1963.

The stipulation stated the total retail and wholesale value of the furs and provided that the twenty-nine fur pieces were photographed on November 19, 1963, resulting in twenty-nine photographs, which are marked Government's Exhibit 3, and that the photographs were fair and accurate representations of each fur piece, contained in the shipment.

The stipulation was read to the jury at the trial.

Government witness Wilbur Moore testified that he had been an employee of REA for about 21 years and worked at the Los Angeles International Airport on November 18, 1963, from midnight to 8 a. m. When shipments which were marked "valuable" arrived he was required to list each waybill number separately on a sheet. The valuable items were placed in a cage for security. Mr. Moore knew that the items involved in this case were valuable because there was a red ball sticker on the waybills.

Mr. Moore testified that he received all of the cases and the cartons listed in the stipulation. He entered the numbers on a registration sheet when he received the goods. The destination and stated value were also entered. Mr. Moore stated the two cases and two cartons were stacked outside the security cage when they were received as they were too large to go in the cage, which was already rather well filled.

Mr. Moore did not see anyone remove the cartons, although he admitted there were a lot of items left outside the cage. He remembers the two cases and four or five large cartons because they were too large to go in the cage. He turned the other valuable items over to his relief when he went off work at 8 a. m. The waybills containing the red ball stickers were attached to the cases. Mr. Moore did not see either of the defendants at any time in the vicinity of the air terminal.

Vincent Masser, an employee of REA on November 18, 1963, was at the Los Angeles International Airport. His duty was to care for valuable cargo. He worked from 12 o'clock midnight to 8:30 in the morning. When he arrived the security cage was filled and there were packages on the outside of the cage. These consisted of two sample cases, plus other boxes. He inspected the packages outside the cage when he came to work and checked the waybill numbers with these packages. He located the sample cases bearing the numbers listed in the

stipulation. At 1 o'clock he stacked the items and put a clip board on top of them. He stacked them because they were all bound for certain destinations and to be picked up later by a driver. He testified the doorway was large enough for a truck to enter. The doorway was always open and there was a fence that separated the doorway from the parking area, but the fence was in such a state of disrepair that anyone could walk over the fence. On November 18, 1963, Mr. Masser observed a car with two people in it in the parking area about 10 feet from the fence. He saw the car after midnight and it was there as late as 1 a. m. He went on his coffee break at 1:45 a .m. The lights of the car were off and the vehicle was facing away from the building. He was pretty sure the occupants of the car were two males seated in the front seat. He later parked his car in the same location and could see through the door and see the cage clearly. When he went on his coffee break on November 18, one employee, Harry Eggers, was left in the building. When Mr. Masser left the four cases were still in their original location. When he returned after half an hour he noticed the sample cases and the four packages were missing, and that the cases bearing the waybill numbers listed in the stipulation were gone. No notation was made by Masser at that time except that he notified the agent that the objects were missing. When he returned he instituted a search for the cartons and cases throughout the REA Air Freight section. They were not in the freight office.

Harry Eggers was an employee of REA at the International Airport and had been so employed for about 20 years. He was on duty November 18, 1963, and was the foreman. He testified that Masser left for his coffee break between 2 and 3 o'clock, although he did not know the exact time. Eggers was in the front office when Masser left. There was no one else present in the building. Masser was gone approximately 30 minutes. From Mr. Egger's position in the front office he could not observe any of the valuables that might have been piled around the cage.

Mr. Eggers did not see or hear anything unusual while Mr. Masser was away.

Joseph Finocchio was employed by REA at the railroad area at the Union Pacific depot on Alameda, between Aliso and Macy Streets in Los Angeles. He was on duty November 18, 1963. A person whom he identified as appellant D'Argento wanted to know where he could ship two sample cases. The witness testified "they were on rollers, castors or whatever you want to call them, and I pointed over to the desk and went inside the office and got Mr. Bates." The sample cases looked something like Government's Exhibits 1 and 2. The gentleman identified by Mr. Finocchio as D'Argento did not have the sample cases with him, but they were 10 or 12 feet away from the desk. There was another man present who was standing in between the two sample cases. Mr. Finocchio did not see where appellant D'Argento came from. He talked to the FBI agent the day after he saw appellant D'Argento, and also talked to the REA security officers. He testified that he saw the man he identified as D'Argento around 6:30 a. m. on November 25th. The other witnesses fixed the date as November 18th. There was nothing unusual about the man asking him how to ship something or where to ship it. Finocchio testified that the person he identified was around 6 feet tall. Finocchio testified as to the man's identity and clothing. He had never been a detective or policeman and could not give a description of the other man who was with the person he identified as D'Argento. The FBI agents, Loughney and Walsh, interviewed him about November 24 or 26.

J. B. Bates, an employee of REA, was on duty November 18, 1963, at the Union Station, at about 6:30 a. m. He was a clerk. He testified that he waited on two gentlemen who had in their possession two shipping cases. He observed the two gentlemen standing near the receiving desk. He could not give the details of

their dress or identify them clearly. They appeared to be young businessmen in their 20's. Mr. Bates testified that they stated they wished to ship the packages prepaid. He gave them shipping tags to fill out. Bates identified D'Argento as the person he saw filling out the shipping tags. Bates gave the persons stickers to put on the cases. The person with D'Argento filled out the stickers. Bates identified Government's Exhibit 7, a carbon copy of the shipping invoice which he turned in at the end of the day. He testified that the shipping invoice indicated that the two sample cases were being shipped to Robert Lisanti, 912 Pulaski, Chicago, and the shipper was W. S. Cox, 3625 Chestnut, Long Beach, California.

The shipping bill showed the charge for the shipment was $23.32, which the two persons paid in cash. He saw the two individuals place the Government's Exhibits 8 and 9, 10 and 11, shipping tags, on the sample cases. He identified the sample cases by the lot stickers which showed the two cases belonged to the same shipment and which were in his handwriting. Mr. Bates identified the two men from whom he received the two sample cases as appellants D'Argento and Caparusso.

Mr. Bates was subjected to cross examination concerning the identity of the defendants. The defendants' counsel questioned whether he could positively identify the individuals and criticized his failure to do so adequately.

W. S. Cox testified that his name appears on Exhibits 8, 9, 10 and 11, shipping tags, but that he was not at the Union Station on November 18, 1963, and that he had never authorized anyone to ship any goods of any nature to Chicago in 1963 in his name, and that he did not know the defendants.

William Robinson testified that he was an employee of the REA at the Union Station and that he saw Mr. Bates at the receiving desk waiting on two male customers on November 18, 1963, about 6:30 a. m. They had two shipping cases which were similar to Government's Exhibits 1 and 2. One of the gentlemen came to the receiving desk and borrowed a pencil from him and after the transaction he returned it. He identified the man as defendant Caparusso. When they left he saw the two men get into an automobile which was a light color with a foreign license tag. He did not know the make of the car or the state of the license, but noticed that it was not a California plate. It was a late model car.

Hayden Davis testified that he was employed by REA at the Union Terminal as a special agent. His job entailed the investigating of thefts and losses. About 5:30 p. m. on November 18, 1963, he observed the two black cases similar to Government's Exhibits 1 and 2. He had them taken to his office and he opened the larger of the two cases and discovered a clip board and an REA form inside. Further investigation revealed that they were furs which were wrapped in muslin. Mr. Davis then phoned the FBI. He locked the cases in a cabinet. The next morning an FBI agent and Mr. Feldstein, who professed to be the owner of the furs, came down and talked to him. Mr. Davis turned the sample cases and contents over to the FBI.

John Loughney testified that he was a special agent of the FBI, stationed in Los Angeles. He received a telephone call from H. B. Davis on November 18, 1963. On the next day he went to Mr. Davis' office and received merchandise from Mr. Davis. The merchandise was in Government's Exhibits 1 and 2. Mr. Loughney opened the cases and found a clip board with some manifest sheets, a pack of Parliament cigarettes and a razor blade. The boxes contained a large quantity of fur pieces. The furs were checked against the original invoice Mr. Feldstein had made up in New York. The furs were identifiable by individual tags which were attached to each fur piece. The furs were placed back in the sample case and transported to the Los Angeles office of the FBI, where they were inventoried. The furs were photographed and all but five of them turned over to Mr. Feldstein. The five remain-

ing furs were present in court at the trial. They were turned over to the United States Marshal before being brought to court.

Thomas H. Walsh, Special Agent for the FBI, testified that he first saw Government Exhibits 1 and 2, the sample cases, in the Los Angeles office of the FBI in the presence of Agent Loughney, Mr. Davis, Mr. Feldstein, and Special Agent Geraghty. Mr. Loughney took possession of the five furs that were in court. Arrangements were made to deliver the furs to Chicago, Illinois, after marking the furs and identifying them and packaging them for shipment. Mr. Walsh escorted the two sample cases with the five furs to Chicago, Illinois. The consignee on both Government's Exhibits 8 and 9 was Robert Lisanti, 912 Pulaski, Chicago, Illinois, Apt. 2. Mr. Walsh took Government's Exhibits 1 and 2 to that address. He arrived at the address on November 22 accompanied by a driver of the REA delivery truck who was in uniform. He knocked on the door and a woman answered. He stated he had packages for Mr. Lisanti. She said she was Mrs. Lisanti and requested that the packages be carried to the residence on the second floor, which was done. Walsh left the cases with Mrs. Lisanti. The driver had her sign the official receipt. Mr. Walsh stated that he never saw anyone on the premises who indicated he was Mr. Lisanti.

Merlin Moore, a Special Agent for the FBI, stated that he went to 912 Pulaski Street in Chicago on November 22, 1963. He had seen appellant D'Argento more than a half dozen times prior to November 22, 1963. Mr. Moore testified that when he arrived at the address on Pulaski Street he rang the door bell and a lady came to the door. He identified himself as an FBI agent and that he had a search warrant. He went into the apartment on the second floor and located the items described in the search warrant, the sample cases, Government's Exhibits 1 and 2. He opened the cases and found the furs inside. Two other FBI agents and Mr. and Mrs. Lisanti were present.

The venetian blinds on the window in the room were partially open and Mr. Lisanti looked through them several times up and down the street. While Moore was still in the apartment the door bell rang and Lisanti went down the stairway to answer the door. Moore was behind him. When Moore stepped in view of a small window in the door he saw appellant D'Argento looking in the window. When D'Argento saw Moore he ran. Moore opened the door and ran after him. D'Argento slipped and fell and Moore arrested him. He was searched and a set of keys was found. Moore testified that in the search of Lisanti's apartment he had found a license plate behind a chest of drawers on the back porch. The license plate was received in evidence.

Benjamin G. Helsel, Jr. of the FBI was with Agent Moore at 912 Pulaski Street at the time of the arrest of D'Argento. He took the keys which were removed from D'Argento, and found a car over a block from the Pulaski address which the keys would fit. D'Argento had been running in the direction where the automobile was parked.

Jack R. Mourning testified that he was a police officer in Beverly Hills, that he was assigned to the detective bureau and that he knew both D'Argento and Caparusso and had seen them prior to the trial. He was asked, after being shown the license plate, whether he had ever seen either of the defendants, or both of them, in possession of a vehicle bearing that license plate. Objection was made and overruled. The officer then testified that he had seen both defendants and this license plate on May 1, 1963, in Beverly Hills, California, and that he testified D'Argento pointed out a 1962 Ford Galaxie, with the license plate in question affixed to it, as being his car. The officer further testified that he saw the two defendants between 9:30 and 10:30 a. m. on November 18, 1963, in Santa Monica, California.

The evidence received on the trial was all from Government witnesses. The appellants did not testify and produced no evidence in their own behalf. The ap-

pellants question the sufficiency of the evidence to sustain the jury verdict and their conviction.

■ The evidence produced at the trial must be viewed in the light most favorable to the Government. The Government is entitled to all reasonable inferences which may be drawn from it. See Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Young v. United States, 298 F.2d 108 (9 Cir. 1962); Teasley v. United States, 292 F.2d 460 (9 Cir. 1961); Ybarra v. United States, 330 F.2d 44, 45 (9 Cir. 1964); Mickelson v. United States, 346 F.2d 952, 954 (9 Cir. 1965).

" * * * (W)e must view the evidence in the light most favorable to sustain the verdict of the jury. (Citations omitted)." Mickelson v. United States, supra.

■ Appellant argues that there was no evidence presented that the furs were removed from interstate commerce. They were in the possession of REA. They appeared later in the possession of the defendants at the express office at the Railway Terminal. The circumstantial evidence was sufficient to establish their removal. It was such that the jury could find the reasonable hypothesis to be that the furs were removed from interstate commerce by the defendants and that they had knowledge and intended to remove them. An agreement between defendants may reasonably be inferred from the circumstantial evidence and the evidence of their conduct at the Railway Terminal that they jointly filled in the shipping tag and each paid part of the transportation charges.

The evidence was sufficient, in our view, to sustain the conviction and support the verdict of the jury.

### Admissibility of Evidence

■ The admission of the evidence of the arrest of the appellant D'Argento is claimed as error. He arrived at the Chicago address at the time a search was being conducted, saw an FBI agent known to him, and he left hurriedly. The court refused to instruct the jury that they could consider the flight as evidence of guilt. There is no specific objection to any item of evidence or any instruction that the court gave. The jury certainly was entitled to know the circumstances of appellant's arrest. When D'Argento went to the Lisanti residence the jury was entitled to infer that he was there to pick up the furs. The furs had been shipped to that address by him. Such conduct was in furtherance of the conspiracy. He did not park his car in front of the residence, he left when he recognized the officer and gave a false name when arrested. As the court said in Embree v. United States, 320 F.2d 666 (9 Cir. 1963), "The conduct of an accused person in seeking to flee following the commission of an alleged crime may be circumstantially relevant to prove both the commission of the act and the intent and purpose for which it was committed."

We consider the evidence competent and relevant and the court did not err in its admission.

D'Argento was stopped by Officer Mourning in Beverly Hills, California, on May 1, 1963. He acknowledged ownership of the automobile he then occupied, which bore the license plate secured from the Chicago address at the time of the execution of the search warrant. The appellant contends that the arrest by Officer Mourning in Beverly Hills on May 1, 1963, was illegal as it was so found by the state court. He urges it was error to permit any evidence of statements about the ownership of the car made at that time by appellant.

■ The objections of the appellant at the trial were not sufficient to raise the question that this evidence was improperly received. Counsel argues that he was prevented by the trial court of showing the nature of the arrest.

■ An illegal arrest may prevent the use of evidence seized for that particular offense for which the arrest was made but the identity of the person, his description, the description of his car and its license number are all matters

that are observable to an alert intelligent officer. Certainly the officer was entitled to stop the car for a routine license check. No evidence offered here was obtained by an arrest. All evidence offered was that of identification.

The objection made by the appellant here is similar to the holding in Lipton v. United States, 348 F.2d 591 (9 Cir. 1965). There the appellant was stopped by a traffic control officer. The officer asked to see the appellant's driver's license. He had none. The officer inquired about the ownership and registration of the car operated by appellant. Misinformation was given and the officer learned by radio that the car had been stolen. Appellant was arrested. The court states at page 593 of 348 F.2d:

"*   *   * If stopping appellant for the sole purpose of inquiring whether he held a license for the activity in which he was engaged was in aný sense a 'seizure' it was not an 'unreasonable' one, and did not violate any right given appellant by the Fourth Amendment, made applicable to the State by the Fourteenth. Cf. Rios v. United States, 364 U.S. 253, 262, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960). A contrary holding would render unenforceable the State statute requiring that automobile drivers be licensed."

▇ Appellant contends that the license plate was obtained from the Lisanti apartment in Chicago in violation of his Fourth Amendment rights. The FBI agents had a search warrant when they entered the apartment. The search warrant was executed on premises in which the appellant had no possessory rights. Rule 41, Federal Rules of Criminal Procedure, 18 U.S.C.A., provides that a person must have a standing to assert a motion to suppress evidence. Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); Von Eichelberger v. United States (9 Cir. 1958), 252 F.2d 184.

The record shows no motion to suppress made by the appellant prior to trial as required by Rule 41(e), Federal Rules

of Criminal Procedure. If a timely motion had been made appellant would have no standing to suppress the evidence taken from the Chicago apartment. As the court stated in Jones v. United States, supra, 362 U.S. page 261, 80 S.Ct. page 731:

"In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else. Rule 41(e) applies the general principle that a party will not be heard to claim a constitutional protection unless he 'belongs to the class for whose sake the constitutional protection is given.' People of State of New York ex rel. Hatch v. Reardon, 204 U.S. 152, 160, 27 S.Ct. 188, 51 L.Ed. 415.  *   *   *"

His complaint that the trial court did not permit him to present evidence of the illegality of the search is answered by that rule. His failure to move to suppress before trial left further action on suppression to the discretion of the trial court. We find no abuse of discretion.

### Failure to Require Election

▇ Appellant argues that the indictment alleges two inconsistent offenses. It charges theft from an interstate shipment in Count 2, and possession of the same goods in Count 3. He argues that the appellant cannot be guilty of both the theft of the goods and the possession of them as it involves the same property. In support of his argument he relies on Milanovich v. United States, 365 U.S. 551, 81 S.Ct. 728, 5 L.Ed.2d 773 (1961). There the defendant was charged with larceny and with receiving the same property taken. The distinction between that case and this one is that the second offense here is the possession of the stolen goods. The two offenses of larceny and the receiving of the stolen property would occur at the same time

and would tend to merge. Here possession of the stolen property would be a continuing offense. No cases have been called to our attention holding that possession and receiving in this context are entitled to the same treatment. We do not consider Milanovich supra to be applicable here. There are two distinct offenses of theft and possession.

There was no error in not requiring the Government to elect or in failing to instruct that there was only one offense.

█ The sentences on the three counts run concurrently. The reversal of the conviction in Count 3 would not entitle the appellant to a reversal of this case. The convictions on Counts 1 and 2 are sustained in this opinion. Therefore, the claimed error in Count 3 would become immaterial.

Irwin v. United States, 338 F.2d 770 (9 Cir. 1964); Brothers v. United States, 328 F.2d 151 (9 Cir. 1964).

Lawn v. United States, 355 U.S. 339, 359, 78 S.Ct. 311, 323, 2 L.Ed.2d 321:

"Lawn also contests the sufficiency of the evidence to support the verdicts against him on Counts 7 and 9, but since the sentences upon those counts run concurrently with the sentence on Count 10, which we have found sustained by the evidence, it is unnecessary for us to consider those contentions. Sinclair v. United States, 279 U.S. 263, 299, 49 S.Ct. 268, 273, 73 L.Ed. 692; Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1779; Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489."

Head v. United States, 346 F.2d 194, 196 (9 Cir. 1965); Mendez v. United States, 349 F.2d 650, 652 (9 Cir. 1965).

### Cumulative Error

█ Appellant contends that the cumulative error of the trial court denied him due process. His brief discusses the refusal of the court to sequester the witnesses at the commencement of the trial. He refers to portions of the record to support his argument that the identification of the defendants by each witness was simplified by permitting all the witnesses to remain in court. Such a motion is directed to the discretion of the trial court. We find no abuse of discretion.

Williamson v. United States, 310 F.2d 192, 198 (9 Cir. 1962):

"The practice of excluding witnesses from the courtroom except while each is testifying is to be strongly recommended, particularly where the testimony of the witnesses is in any measure cumulative or corroborative. It is nonetheless the uniform federal rule, prevailing also in a majority of the states, that a motion to sequester is addressed to the discretion of the trial court."

The conviction of the appellant is affirmed.