**UNITED STATES of America,**
v.
**Lowell M. BIRRELL, Defendant.**

United States District Court
S. D. New York.

June 11, 1965.

WYATT, District Judge.

Defendant Lowell M. Birrell has moved, in each of the six criminal proceedings designated by the six file numbers shown above and based on six indictments handed up to this Court:

a. for the return of property secured by an alleged unlawful search and seizure and also to suppress that property for use as evidence (Fed.R. Crim.P. 41(e));

b. under Fed.R.Crim.P. 12(b) (4) —perhaps more properly to be made under Fed.R.Crim.P. 41(e) itself—for a hearing to take evidence on the motion to suppress; and

c. for an order directing the United States Attorney to produce at the hearing asked under (b) "the filing cabinets, cartons and other containers * * * seized * * *".

Defendant Birrell has further moved:

d. under Fed.R.Crim.P. 12 for orders dismissing the six indictments on the asserted ground that evidence illegally seized was produced before the grand juries; and

e. under Fed.R.Crim.P. 6(e) for an order granting him inspection of the minutes of the several grand juries, this "in aid of" the motion described in (d) above.

The caption of the motion papers, as also used above, shows only movant Birrell as "Defendant". In fact, in each of the indictments, others than movant Birrell were named as defendants along with him.

The indictments charge a variety of offenses, the details of which are presently irrelevant. In general, the offenses include violations of the Securities Act of 1933 (15 U.S.C. § 77a and following), the Securities Exchange Act of 1934 (15 U.S.C. § 78a and following), the mail fraud statute (18 U.S.C. § 1341), and transportation of stolen property in interstate commerce (18 U.S.C. § 2314). It may be noted that the earliest indictment (C 159–275) was dismissed by the United States Attorney by leave of Court

Robert M. Morgenthau, U. S. Atty. for Southern District of New York, Gerald Walpin, Paul R. Grand, Otto G. Obermaier, Asst. U. S. Attys., of counsel, for United States of America.

William B. Pennell, New York City, Menahem Stim, New York City, William B. Pennell, New York City, of counsel, for defendant.

on March 24, 1965—after this motion had been argued and submitted.

## I.

The property which is the subject of this motion (together sometimes for convenience referred to as the "seized property") consists of

(1) certain records, including some of Echo Falls Farm and Bucks County Farms, Inc., obtained on July 24, 1959 by the District Attorney of New York County from premises on Sugar Bottom Road, Furlong, Bucks County, Pennsylvania;

(2) certain files, records and information seized at premises on Sugar Botton Road, Furlong, Bucks County, Pennsylvania on August 22, 1959 by a Deputy United States Marshal for the Eastern District of Pennsylvania under a search warrant issued that day by a United States Commissioner in the Eastern District of Pennsylvania; and

(3) certain files, records and information seized at premises (known as the "Schulberg Farm") on Old York Road near Ingham Spring Road, New Hope, Bucks County, Pennsylvania on August 24, 1959 by a Deputy United States Marshal for the Eastern District of Pennsylvania under a search warrant issued that day by a United States Commissioner in the Eastern District of Pennsylvania.

As will be later explained, all of the seized property, except that obtained on July 24, 1959, is presently in the custody of the Clerk of this Court under an order of Judge Palmieri filed on October 26, 1959.

## II.

The moving and opposing papers give the general background for the obtaining and the seizure of the property which is the subject of this motion. It is believed proper for the Court judicially to notice some further background facts, in order that the relevant events may better appear in context.

The facts, which appear without substantial dispute from the moving and opposing papers as supplemented by some facts judicially noticed, appear to be as follows:

Birrell was admitted to the New York Bar in January, 1930, and for many years thereafter practiced law or engaged in business or both in the City of New York.

A subpoena was issued by this Court requiring Birrell to appear on October 7, 1957 to testify in Securities and Exchange Commission v. Swan-Finch Oil Corporation, et al., Civil 119–232. He did not appear (13 A.D.2d 220, 215 N.Y. S.2d 293, 1st Dept., 1961) and sometime in October 1957 left this country (N.Y. Times, April 24, 1964, page 52).

One of the enterprises with which Birrell was associated was Equitable Plan Company ("Equitable"), a California corporation. On March 17, 1958 certain creditors of Equitable filed in the United States District Court for the Southern District of California a petition for the reorganization of Equitable under Chapter X of the Bankruptcy Act (11 U.S.C. § 501 and following; see §§ 526, 530, 531). By order filed May 29, 1958 the petition was approved by the District Court and a Trustee appointed (11 U.S.C. § 556). The District Court also referred the proceeding to Referee in Bankruptcy Brink "to hear and determine" etc. (11 U.S.C. § 517).

The Trustee of Equitable thereafter retained a law firm in New York City to represent him in this District and a member of that firm, Edward C. Kalaidjian, became active here for the Equitable Trustee.

The District Court in California authorized the Trustee of Equitable to institute ancillary proceedings in this District "for the purpose of conducting examinations and investigations". On petition of the Trustee, an order of this Court "for ancillary examination of witnesses" was made by Judge Dimock and filed on December 2, 1958. This order directed a number of persons, including

Birrell "and such other witnesses as may * * * appear necessary" to appear before a Referee in Bankruptcy to be examined concerning the property, financial condition, etc. of Equitable and the acts of its former management; the order directed that "subpoenae" issue for the appearance of the witnesses and production of papers, etc. The order referred the proceeding to Referee Loewenthal "to hear and determine the time, place and manner of such examinations * * *".

█ This order of Judge Dimock was clearly proper because while ancillary proceedings are generally "unnecessary" in reorganization proceedings under Chapter X and "inconsistent" with its "context and objective" (6 Collier on Bankruptcy (14th ed.) 602), nevertheless they may be employed, on the authority of 11 U.S.C. § 11, sub. a(7), "in aid of reorganization decrees where necessary or convenient". Mar-Tex Realization Corp. v. Wolfson, 145 F.2d 360, 364 (2d Cir. 1944).

Before Birrell left the country in October 1957, he apparently deposited the seized property for storage with Jonathan D. Dunn, a Pennsylvania lawyer who was an attorney for Birrell. I say "apparently" because although Birrell's affidavit gives the strong impression of a representation that he deposited the property with Dunn before October 1957, he does not actually say so and the affidavit of Dunn is that he (Dunn) was attorney for Birrell only from "early 1959".

In any event by July 1959 the seized property was in the custody of Dunn, being held in storage for Birrell.

Dunn occupied as his home premises on Sugar Bottom Road, Furlong, Bucks County, Pennsylvania and seems to have had (a little away from his house) a combination garage and office there. (His listing in Martindale-Hubbell Law Directory for 1959 and later years is under Doylestown, Pennsylvania). Much of the seized property was stored at the Sugar Bottom Road premises in the combination garage and office. Much was also stored in the barn on the Schulberg Farm on Old York Road, which farm (according to Dunn's affidavit) was under his "control and management".

Birrell states in his affidavit that the seized property stored by him with Dunn is his "private, personal and business papers" which had been in his "possession and control for many years" and which were stored with Dunn when Birrell "closed" his "personal business office and law office". Birrell in his affidavit refers also to "originals or copies of corporate books and records" which he states had been in his "possession and control for many years". He does not state the names of any corporations whose "corporate books and records" are among the seized property. He does not claim to own the "corporate books and records" and could scarcely make such a claim, since "corporate books and records" would belong to the corporation or its successor or representative (such as receiver, trustee and the like). It is assumed, therefore, that some of the seized property consists of personal and business papers belonging to Birrell and some of it consists of corporate papers not belonging to Birrell but which had been in his possession and control.

In 1959, Hallisey, an Assistant District Attorney of New York County, was investigating alleged fraud involving (among others) Birrell and Swan-Finch Oil Corporation. In response to a request Joseph A. De Risi appeared at the office of Hallisey on July 24, 1959 and was interviewed. The precise status of De Risi cannot be determined on the present papers. An affidavit of Hallisey states that, according to De Risi, he (De Risi) was employed by Birrell "as a bookkeeper" and was "an officer and employee of Bucks County Farms, Inc." and worked "on these books and records" at the Sugar Bottom Road premises. A letter from Dunn to the District Attorney refers to De Risi as "my employee and accountant" and as an officer "of Echo Falls Farm and Bucks County Farms, Inc." There is no affidavit from De Risi and he is not mentioned in Birrell's affidavit.

At the interview on July 24, 1959 Hallisey gave De Risi a subpoena. According to the Hallisey affidavit, the subpoena "called for the delivery of the records of those companies he had agreed to deliver to me". No copy of the subpoena has been submitted. Presumably "those companies" includes Echo Falls Farm and Bucks County Farms, Inc.

On the same day—July 24, 1959—at the direction of Hallisey Detective John Desmond, attached to the District Attorney's office, drove De Risi to the Dunn premises on Sugar Bottom Road. There De Risi turned over to Desmond certain books and records, not identified on this motion.

The circumstances of the De Risi July 24, 1959 visit to Sugar Bottom Road cannot be determined from the papers before the Court, nor whether the visit was voluntary or coerced.

A subpoena duly issued out of this Court at the request of counsel for the Equitable Trustee requiring De Risi to appear before Referee Loewenthal on August 20, 1959 and to bring with him, according to Kalaidjian's affidavit, "records relating to all corporations and persons with whom Lowell Birrell had been associated from January 1, 1953 to the date thereof".

De Risi appeared for examination on August 20, 1959 but without records. He testified, under questioning by Kalaidjian, that he had delivered to Hallisey some of the records called for by the subpoena of this Court and that other records called for were at the Dunn premises on Sugar Bottom Road in a combination garage and office some fifty feet from the house in which Dunn lived.

A subpoena then issued out of this Court under date of August 20, 1959, at the request of Kalaidjian and directed to Dunn, requiring him to appear in this Court on August 27, 1959 and to produce records "pertaining" to a long list of corporations and individuals which were believed by Kalaidjian to have been involved in a "looting" of Equitable and with which Birrell was believed to have been associated.

On the same day—August 20, 1959— Kalaidjian gave by telephone to California counsel for the Trustee the information to which De Risi had testified as to the location of records on Sugar Bottom Road. Later that day, California counsel informed Kalaidjian by telephone that United States Postal inspectors were investigating Birrell, that they (California counsel) had informed the postal inspectors about the location of the records on the Dunn premises, and that the postal authorities proposed to ask for a search warrant.

California counsel for the Trustee of Equitable then obtained from Referee Brink an order, made and filed on August 21, 1959, that all of the records of Birrell and all records "related" to his activities be "impounded" and that the records "be forthwith delivered" to the Clerk of this Court or to the United States Marshal "having jurisdiction in the area in which said records are located, to be held by them subject to and under the further order of this Court" [that is, the United States District Court for the Southern District of California].

On the next day, Saturday, August 22, 1959, Kalaidjian and his associate went to Philadelphia and there Kalaidjian at the request of Assistant United States Attorney Phelan and of postal inspectors, made an affidavit before a United States Commissioner to secure a search warrant for the Sugar Bottom Road premises of Dunn. As will later be seen, the affidavit of Kalaidjian so far as showing "grounds for issuing the warrant" was sketchy in the extreme (Fed.R.Crim.P. 41(c)). The warrant nevertheless issued, describing the premises at Sugar Bottom Road at which the "property" was said to be papers in 24 filing cabinets concerning numerous individuals and corporations on a long list annexed to the warrant and which papers were stated in the warrant to have been used by Birrell "in committing a violation of Title 18, United States Code, Section 1341". The warrant was directed to "William A. O'Brien, United States Mar-

shal, and H. Lawrence Clark, Deputy United States Marshal".

A party was then made up to proceed to the Dunn premises on Sugar Bottom Road. The party consisted of Kalaidjian and his associate (who had with them the subopena duces tecum directed to Dunn and a copy of the impounding order of Referee Brink), Assistant United States Attorney Phelan, Postal Inspector Hillegass, and Deputy United States Marshals Clark (who had with him the search warrant) and De Palma.

At the Dunn premises, the subpoena duces tecum, the impounding order, and the search warrant were served on Dunn. The files stored by Birrell were pointed out by Dunn and he also informed the group that there were other such files located in a barn on the Schulberg Farm. The associate of Kalaidjian is said to have advised Dunn that he could comply with the subpoena duces tecum by surrendering the records to the Marshal. Kalaidjian states in his affidavit that Dunn replied that he (Dunn) "would prefer that procedure rather than being involved in the transportation of the documents to the Southern District of New York". Dunn in his affidavit states: "I objected to the seizure of these records and did not voluntarily consent to them being taken."

In any event, Deputy Marshal Clark that day (August 22, 1959) took into his custody and carried to Philadelphia all the Birrell records at the Sugar Bottom Road premises. Apparently no attempt was made to "search" for records answering the description, broad as it was, in the warrant. The warrant (for example) commanded a search for records *after* January 1, 1953 but this limitation was apparently ignored, because everything stored by Birrell was taken, whether business or personal, whether before January 1, 1953 or after.

The return of the Marshal states that he searched the premises on August 22, 1959 and took pursuant to the warrant "(21) metal and/or wooden file cabinets * * * and thirteen independent cab-

inets * * * also six (6) cardboard cartons * * * also one (1) strongbox locked."

On Monday, August 24, 1959, Postal Inspector Hillegass made an affidavit for a search warrant of the Schulberg Farm before a United States Commissioner. The warrant issued, describing the premises as "Schulberg Farms, Old York Road near Ingham Spring Road, New Hope, Pa.". Deputy Marshal Clark went to Schulberg Farm on August 24, 1959 and took under the warrant all Birrell records stored there. The return of the Marshal states that he searched Schulberg Farm and took pursuant to the warrant "21 metal and/or wooden file cabinets * * * one (1) metal file cabinet * * * one (1) wooden bureau * * * containing files, records and information * * *".

Under date of October 16, 1959, Judge Palmieri made an order in the ancillary proceedings of Equitable in this Court (No. 93698) and in the reorganization proceedings in this Court of Swan-Finch Oil Corporation (No. 93046). This order, filed October 26, 1959, directed that all of the records taken into the custody of the United States Marshal for the Eastern District of Pennsylvania be delivered to the Clerk of this Court to be held by him until further order.

By order filed November 10, 1959, Judge Lord of the United States District Court for the Eastern District of Pennsylvania similarly directed that the records be delivered to the Clerk of this Court and such was done.

The property seized on August 22 and 24, 1959 is thus presently in the custody of the Clerk of this Court.

The five indictments pending in this Court against Birrell were returned at various times in 1961 and 1962.

The memorandum for the government states (pages 13–14) that the records obtained on July 24, 1959 by the New York County District Attorney were by him delivered on November 29, 1961 to the United States Attorney for this District, by whom they are presently held.

Bench warrants for the arrest of Birrell duly issued in respect of each of the indictments. They were executed on April 23, 1964 when Birrell returned, or was returned, from Brazil. Birrell is presently in custody awaiting trial of the indictments.

### III.

The government urges that Birrell is not a "person aggrieved" within the meaning of Fed.R.Crim.P. 41(e) and therefore has no standing to make this motion.

The argument for the government is that Birrell had no property interest in the premises searched and that the papers seized include "corporate books and records", as stated in Birrell's affidavit, which must belong to various corporations and as to which Birrell could not maintain this motion under the principle of United States v. Guterma, 272 F.2d 344 (2d Cir. 1959), more recently applied in United States v. Fago, 319 F.2d 791 (2d Cir. 1963). The principle of the two cited cases is that records belonging to a corporation may be required by subpoena to be produced in a criminal proceeding and that an individual, even the sole stockholder, has no standing to assert any privilege for the corporation.

■ It seems to me clear that Birrell does have such an interest even in the "corporate books and records" as to make him a "person aggrieved" under Fed.R. Crim.P. 41(e).

Any test of standing to make such a motion as this must start with Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Narcotics agents arrested Jones in an apartment while they were executing a search warrant and in the course of which they found narcotics. Jones moved to suppress the narcotics as evidence on the claim that there was no probable cause for issuance of the warrant. The government argued (and was sustained below) that Jones had no standing to make the motion because (a) he was merely a guest or invitee in the apartment and thus had no

sufficient interest in the premises searched and (b) he did not claim ownership of the property seized. The Supreme Court unanimously held that Jones had standing to make the motion and in giving the Court's opinion Mr. Justice Frankfurter summarized the test as follows (362 U.S. at 261, 80 S.Ct. at 731):

> "In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else."

It is overwhelmingly established that the searches here in question were directed solely and exclusively against Birrell. The only person suggested in the papers as having violated the law was Birrell. The first search warrant described the records as having been used "in committing a violation of Title 18, United States Code, Section 1341, by the use of the mails by one Lowell M. Birrell * * *". The second search warrant was captioned: "United States of America v. Lowell M. Birrell".

It may be, as argued for the government, that the test—"against whom the search was directed"—above quoted from Jones should be limited to cases where *possession* of the property seized is a crime and where the possessor would therefore "wince at admitting possession" (Connolly v. Medalie, 58 F.2d 629, 630; 2d Cir. 1932).

But Jones goes further and—perhaps technically by way of dicta—deals with the situation (as in the case at bar) *not* "turning on illicit possession" (362 U.S. at 263, 80 S.Ct. 725). The opinion in Jones rejects the former strict tests (for standing to make a motion to suppress) as to the property interest in the premises searched and, at least by implication, in the property seized. The Supreme Court in Jones departed from the earlier "course of decisions by the lower courts" and announced that such motions as this

should not be decided on "subtle distinctions, developed and refined by the common law in evolving the body of private property law" (362 U.S. at 266, 80 S.Ct. at 733).

In the case at bar, however, Birrell has such an interest in the seized property as to give him standing on this motion—whether tested by the rule before Jones or after Jones.

Birrell is the owner of a part of the seized property and was the possessor of all of it, at least until he stored it with Dunn, after which he had constructive possession at the minimum. No claim is made by the government that Birrell's possession was unlawful.

██ Possession (actual or constructive), no less than ownership, gives standing to move to suppress. Such was the rule even before Jones.

This was held in connection with the first seizure in United States v. Antonelli Fireworks Co., 53 F.Supp. 870 (W.D.N.Y. 1943), affirmed 155 F.2d 631, 633 (2d Cir. 1946). Antonelli was arrested in his home, at which time an unlawful search of the premises took place and records were seized; some of the records belonged to Antonelli personally and some to a corporation with which he was connected. A motion by Antonelli to suppress *all* such records for use as evidence against him was granted. The Court stated (53 F.Supp. at 873):

> "The lawful possession by Antonelli of documents and property, either his own or the corporation's, was entitled to protection against unreasonable search and seizure".

This also seems explicitly laid down in Matthews v. Correa, 135 F.2d 534, 537 (2d Cir. 1943) where the government denied any standing of the movant because, while the property was seized from the possession of movant, title to that property was in a bankruptcy trustee. The Court said that "a possessory interest alone seems adequate * * * and it would seem that petitioner's possession of the personal property here would be sufficient interest in accordance with the usual rule that possession alone is adequate against a trespasser" (135 F.2d at 537).

In Henzel v. United States, 296 F.2d 650 (5th Cir. 1961), Henzel was president and sole stockholder of a corporation. Postal inspectors made a search of the corporate premises and seized corporate books and papers. Henzel moved to suppress such corporate books and papers and was held to have standing to do so because (1) he was closely connected to the corporation, (2) he had prepared much of the material seized, (3) the seized material was kept in his own office on the corporate premises and he kept some of his personal belongings there, (4) he spent most of his time in his office although he was temporarily absent when the search was made, and (5) the search was directed against him.

In Villano v. United States, 310 F.2d 680 (10th Cir. 1962) Villano was taken to his place of employment where the desk he used was unlawfully searched and two notebooks found therein. Villano did not own the notebooks or the desk which was searched, denied "true possessory interest" in the notebooks, and did not appear to have exclusive use of the desk. Nevertheless, the Court followed what it believed to be the liberalizing influence of Jones, as reflected also in Henzel, and found that Villano had standing to move to suppress; the Court noted "an atmosphere of invasion of privacy" (310 F.2d at 683).

While it is not known what connection may have existed between Birrell and the corporations whose records are among those seized, it seems clear that the case for standing in Birrell is far stronger than that for Henzel or Villano. This is because Birrell had had actual possession of the corporate records and had at least constructive possession of them when they were seized. It was said in Schwimmer v. United States, 232 F.2d 855, 860 (8th Cir. 1956):

> "Such a motion to quash is entitled to be made by the owner of books and papers, in relation to a

grand jury investigation of him, as to a subpoena duces tecum issued against a third party, in whose possession the books and papers are, but who is merely a custodian, without personal right in the books and papers as such, and with constructive possession and control of them thus remaining in the owner. The law recognizes no distinction between constructive possession, with control, and physical possession, as a basis for a subpoena to compel production, so that such process directed to and served upon an owner, who is in constructive possession and control, is as legally capable of commanding the production of his books and papers as is one against a third party, who is in physical possession of them for him."

■ If, as thus indicated, Birrell had at least constructive possession of the records stored with Dunn, it matters not whether he had any interest in the premises searched. See also Jeffers v. United States, 88 U.S.App.D.C. 58, 187 F.2d 498 (1950), affirmed 342 U.S. 48, 72 S. Ct. 93, 96 L.Ed. 59 (1951).

It is unnecessary, therefore, to consider whether Birrell had a sufficient interest in the premises to have standing on this motion. But it might plausibly be contended, under the influence of Jones, that he did.

Some of the cases on which the government strongly relies should be mentioned.

In United States v. Guterma, above cited, the motion was to quash a grand jury subpoena served on F. L. Jacobs Co. requiring production of records of Guterma and Chatham Corp. (wholly owned by him). Guterma and Chatham Corp. had already been indicted by a grand jury and the subpoena was issued in aid of a further investigation. Our Court of Appeals held that Guterma had standing to move to quash the subpoena as to his *personal* records but not as to the records of Chatham Corp.

It must first be noted that Guterma involved a subpoena duces tecum served on a corporation to produce (a) the personal records of Guterma and (b) the corporate records of Chatham Corp.

A subpoena commanding production of corporate records and which is too broad and sweeping (that is, dragnet in its scope) may be resisted as in violation of rights of the corporation under the Fourth Amendment. Hale v. Henkel, 201 U.S. 43, 76, 26 S.Ct. 370, 50 L.Ed. 652 (1906); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

But a corporation may be compelled by proper subpoena duces tecum to produce its books and papers and may not resist on the ground of self-incrimination under the Fifth Amendment. Hale v. Henkel, above.

Thus, it may be seen that a significant difference between Guterma and the case at bar is that Guterma involved a subpoena duces tecum served on a third party whereas here there is a claimed unlawful search and seizure.

There are other differences between Guterma and the case at bar: (a) the subpoena was directed against Chatham Corp., the records of which were sought, because the records were required also for use against Chatham Corp., which had been indicted and was under investigation, as well as for use against Guterma, (b) the privilege upheld for Guterma was that against self-incrimination under the Fifth Amendment, and (c) the privilege against self-incrimination was not available to Chatham Corp. because the privilege does not extend to corporations.

While Guterma was thus a subpoena case, United States v. Lagow, 159 F.2d 245 (2d Cir. 1946), on which the government relies, was a search and seizure case. The search in Lagow, however, was on the premises of a corporation of which Lagow was sole stockholder, it did not appear whether the search was directed against the corporation or against Lagow, (apparently) was not of any of-

fice used by Lagow, and (apparently) the seizure did not include any seizure of personal records of Lagow. These seem to be significant distinctions from the case at bar.

If the distinctions above suggested between Guterma and Lagow on the one hand and the case at bar on the other are not valid, I would then conclude that Guterma and Lagow ought not to be followed because Jones has left them without authority in such a situation as we have here. In an unreported decision, Judge McGohey reached the same conclusion. United States v. Bradford, M 18–65 (S.D.N.Y. April 10, 1963).

IV.

The records taken on August 22 and 24, 1959 were seized under two search warrants. It must first be determined whether there was "probable cause for believing the existence of the grounds on which the warrant was issued". Fed. R.Crim.P. 41(e).

■ The August 22, 1959 warrant was issued on the affidavit of Kalaidjian. This merely recites in substance that he has reason to believe that certain records are being concealed at the Sugar Bottom Road premises, which records "have been used in committing a violation of Title 18, United States Code, Section 1341 * * *". There is not a single fact stated which even tends to show that Birrell used the mails, or that the described books and records were used as the means of committing *any* offense, let alone as the means for committing a violation of 18 U.S.C. § 1341. The affidavit is plainly insufficient on its face.

With reference to the showing of probable cause required for a search warrant, the Supreme Court has recently said in United States v. Ventresca, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965):

"Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police."

Over the dissent of two members, the Supreme Court found that probable cause had been shown. Two members of the Court of Appeals for the First Circuit had found no probable cause to have been shown. Since four justices or judges considered the affidavit in Ventresca to be insufficient, it is instructive to compare that affidavit (see appendix to majority opinion, 380 U.S. at 112–116, 85 S.Ct. 741) with the affidavits submitted to the Commissioner in the case at bar.

The affidavit of Postal Inspector Hillegass, submitted in support of the application for a search warrant on August 24, 1959 suffers from the same defects as the earlier affidavit. It is likewise insufficient on its face. The government, with commendable frankness concedes (memorandum, page 96) that if the August 22, 1959 warrant is void, so also is that of August 24, 1959.

■ The government argues that sworn information was presented to the Commissioner other than that contained in the affidavits. If so, such information may not be considered on the present motion. See Tripodi v. Morgenthau, 213 F. Supp. 735, 738 (S.D.N.Y.1962).

Fed.R.Crim.P. 41(c) provides in relevant part:

"A warrant shall issue only on affidavit sworn to before the judge or commissioner and establishing the grounds for issuing the warrant."

An "affidavit" by definition refers to "a sworn statement *in writing* made esp. under oath * * *" (Webster's Third New International Dictionary, p. 35; emphasis supplied).

Nothing in writing was presented to the Commissioner except the affidavits and they alone may be considered in testing the warrants.

■ Since there was no showing to the Commissioner of probable cause for believing the existence of the grounds on which the warrants were issued, such warrants were void and the searches and seizures thereunder were unlawful.

### V.

It is argued for the government that, if the search warrants be void, the impounding order of Referee Brink provides a "legal basis" for taking possession of the records, "independent of the search warrant".

In order to judge of the extraordinary character of the Referee Brink order, it is useful to note what is the normal character of an impounding order.

 After books and records have been produced before the Court in obedience to a subpoena duces tecum or other proper order requiring their production, the Court may, on a proper showing, "impound" them—that is, take them into the custody of the Court (without, of course, in any way affecting title).

It has been said: "That impounding is a drastic measure may be seen from the reluctance with which courts grant it". Hagan, Impounding and the Subpoena Duces Tecum, 26 Brooklyn L.Rev. 199, 230 (1960).

An example of a proper impounding order is found in Perlman Rim Corp. v. Firestone Tire & Rubber Co., 244 F. 304 (S.D.N.Y.1917). During the trial, a witness testified and identified exhibits. His testimony appeared to be false and that an indictment for perjury was in order. Judge Hand impounded the exhibits.

Another example is in United States v. Guterma, 174 F.Supp. 581 (E.D.N.Y. 1959). A subpoena required the production of records stored in a warehouse. Some of the records belonged to Guterma personally and were not subject to subpoena (Fifth Amendment). Others of the records belonged to a corporation and were subject to the subpoena. In order to protect the rights of Guterma and prevent access by the United States Attorney to the personal papers, the Court declared that the records would be delivered to the Court and "will be impounded for inspection by the Court" (174 F.Supp. at 583).

Thus, some of the reasons which might constitute a proper showing for an impounding order *after* the records are produced in Court (for example, under a subpoena), are the existence of grounds to fear the disappearance of the records or their alteration, necessity for use of the records in subsequent criminal proceedings (as in Perlman, above), necessity for Court custody to permit examination by numerous interested parties, and the like. Such appears from the cases cited on this point for the government, for example in the two bankruptcy cases (where the impounding order was by the District Judge and not the Referee): In re Fox, 96 F.2d 20, 21 (3d Cir. 1938); In re Ironclad Mfg. Co., 201 F. 66, 68 (2d Cir. 1912). (While totally irrelevant to the present discussion, an interesting, but not inspiring, description of the Fox litigation may be found in Borkin, The Corrupt Judge (New York 1962) 97–137, especially 101–108.)

In defining "impound" Black's Law Dictionary (4th ed.) 899 states: "To take into the custody of the law or of a court. Thus, a court will sometimes *impound* a suspicious document produced at a trial" (emphasis in original). Probably the most fascinating example of an impounding order for such a reason was that made after production in Court of the "Dear Wife" letters in the famous Sharon litigation in California. See Kroninger, Sarah & the Senator (Berkeley, California, 1964) 105, also 31; related litigation, In re Neagle, 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55 (1889).

An impounding order, as indicated, is normally made *after* documents have been produced in Court under subpoena or other order, or sometimes voluntarily (as in Sharon). The impounding order is thus made, not to *obtain* custody for the Court but to retain a custody already properly acquired by other means (normally a subpoena).

An example of the normal and proper use of an impounding order is found in Chapter X itself, in Section 166 of the Bankruptcy Act (11 U.S.C. § 566). The "court" is there authorized to "direct the impounding" of schedules, lists, etc.

"filed" with the Court under other sections of Chapter X. The papers are thus impounded *after* they have been filed in the Court, the purpose being to restrict the information contained therein to those specifically authorized by the Court. It may be doubted whether a Referee (as opposed to the District Judge) has any authority even to make this sort of an impounding order; in any event a hearing would seem to be required. 11 U.S.C. § 606. And this impounding order, authorized by the cited statutes, is to be made, like other impounding orders, only where the situation is "unusual". Delatour v. Meredith, 144 F.2d 594, 596 (2d Cir. 1944).

Contrary to the normal function of an impounding order, that made by Referee Brink was an attempt itself to secure custody of the records it so sweepingly described. It thus may not be justified as the normal impounding order which a Court is authorized to make.

If an order such as that of Referee Brink be valid, why should search warrants ever be obtained or why should subpoenas duces tecum ever be made specific?

■ The petition to Referee Brink merely recited that Birrell "was instrumental and a principal in defrauding the certificate holders of Equitable", that he "converted the assets of the Debtor to his own uses", and that the records with Dunn "would be of great aid and assistance". These averments give not the slightest justification for the order made.

That the impounding order of the Referee is wholly unauthorized can also be seen from inquiry whether the Referee could have issued a subpoena duces tecum *requiring production of the records* as described in the impounding order.

■ In the first place, the Referee has no authority to issue *any* subpoena. Subpoenas in bankruptcy proceedings must "issue out of the court, under the seal thereof, and be tested by the clerk" (General Order in Bankruptcy 3). The Referee, of course, may be furnished such subpoenas and thus may *cause* them to be issued "out of the court".

■ But any subpoena so obtained by a Referee in Bankruptcy in Chapter X proceedings is subject to Fed.R.Civ.P. 45. This follows from General Orders in Bankruptcy 37 and 52.

If Referee Brink had caused a subpoena thus to be issued instead of making the impounding order, such subpoena would have to be "directed" to some "person". Fed.R.Civ.P. 45(a). The impounding order was directed to no one but by its terms was applicable to the world at large.

More importantly any subpoena caused to be issued by the Referee could only be served within the Southern District of California or within 100 miles of Los Angeles. Fed.R.Civ.P. 45(e) (1).

■ It cannot be seriously supposed that a Referee in Los Angeles, without authority to issue any subpoena duces tecum and with authority only to cause such a subpoena to be issued effective within his District or within 100 miles of Los Angeles, could avoid such limitations on his authority (and on that of the District Court in California) merely by making an "order impounding records". And it cannot be seriously supposed that any such order would be effective to subject records in Pennsylvania to "the further orders" of the District Court in California.

In this connection, note should be taken of the curious reason given to the Referee for the impounding order, namely, that if a "subpoena or order of court" were used to obtain the records they "may be hidden". In other words, a subpoena issued out this Court or the District Court for the Eastern District of Pennsylvania—disobedience of which would be punishable summarily as a contempt (Nilva v. United States, 352 U.S. 385, 77 S.Ct. 431, 1 L.Ed.2d 415 (1957)) —would be less effective than an "order impounding records" made by a Referee in Bankruptcy in California!

■ Moreover, the orders of a Referee in Bankruptcy are surely as sub-

ject to the Fourth Amendment as are orders of the Commissioner and of this Court.

■ Indeed, the order of Referee Brink was the equivalent of a search warrant and should be tested as such. The Referee had no authority to issue any search warrant and, if he did have such authority, the "warrant" he here issued was not based on any showing of probable cause to believe that any grounds existed for a warrant and, moreover, the "warrant" he here issued was much broader in the sweep of documents directed to be seized than could possibly have been justified in any true search warrant.

A similar situation was before the Court in People v. Carver, 172 Misc. 820, 16 N.Y.S.2d 268 (Kings County Ct. 1939). The District Attorney moved to impound books and records in the possession of the General Counsel to the Industrial Commissioner. The motion was denied, among other reasons because such an order would be "nullifying" the statutory requirements for a search warrant.

■ If tested as a subpoena, the order of Referee Brink is likewise invalid under the Fourth Amendment as "far too sweeping". At least since Hale v. Henkel, 201 U.S. 43, 76–77, 26 S.Ct. 370, 50 L.Ed. 652 (1906) a subpoena or other order for the production of records which is "far too sweeping in its terms" (201 U.S. at 76, 26 S.Ct. at 380) is violative of the protection of the Fourth Amendment.

■ The impounding order of Referee Brink is no justification for seizure of the property because (a) it was in excess of any authority of the Referee, (b) it was issued without any sufficient basis in fact, and (c) it was in violation of the Fourth Amendment.

## VI.

■ The further argument is made for the government that the subpoena duces tecum issued out of this Court to Dunn and served on Dunn on August 22, 1959 was valid; that Dunn voluntarily complied with the subpoena by turning over to the Marshal for the Eastern District of Pennsylvania the records called for by the subpoena; and that "the Bankruptcy Court properly obtained custody of the documents which defendant Birrell here requests the Court to suppress" (memorandum, page 26).

The subpoena must be looked at to see what it commands. The command is that Dunn appear before this Court on August 27, 1959 and bring with him the records "then and there to testify". Most distinctly the subpoena does *not* command that Dunn "deliver custody of all the property, here in question, to the jurisdiction of the Bankruptcy Court * * *", as the government contends (memorandum, page 23). Dunn could comply with the subpoena by attending with the records during the hours of court and keeping his records with him at all other times. As Judge Weinfeld has said (Application of Kelly, 19 F.R.D. 269, S.D.N.Y.1956): "A subpoena duces tecum, unlike a search warrant, does not serve to disturb possession of property".

The command of the subpoena was the command of this Court. It was not possible for Dunn to agree with counsel for the Equitable Trustee that he "would comply with the subpoena by delivering the subpoenaed documents to the custody of the United States Marshal for the Eastern District of Pennsylvania", as the government asserts (supplemental memo. of law, p. 2). Compliance with the subpoena is exclusively for the determination of this Court.

Moreover, whether Dunn made the claimed agreement or not, in fact he did not turn over the records to the Marshal in compliance with the subpoena. In fact and as conclusively established by the returns of the Marshal, the records were seized by the Marshal under the authority of the search warrants. The returns state: "The following is an inventory of property taken pursuant to the warrant:" and then follows a description of the mass of records involved on this motion.

The Marshal, having thus taken the records under the search warrants, it was thereafter impossible for Dunn to comply with the subpoena of this Court. On a showing of the facts, it would have been the duty of this Court to excuse compliance with the subpoena.

## VII.

The motion by Birrell to dismiss the indictments is without merit. The ground is that "illegally seized" evidence or "the fruit thereof" was submitted to the respective grand juries. There is no claim that this was the only evidence submitted.

In Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 409, 100 L.Ed. 397 (1956) the Supreme Court said:

"An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more."

The Costello decision dealt with the submission of only hearsay evidence to a grand jury.

In Lawn v. United States, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958) this Court had denied a hearing on a motion to dismiss an indictment, and had denied a motion to inspect the grand jury minutes. Defendants claimed they were denied due process because they were deprived of an opportunity to determine whether illegal evidence was submitted to the grand jury. In approving the action of this Court, the Supreme Court appeared to treat the use of illegally obtained evidence before a grand jury on the same basis as hearsay evidence, pointing out (355 U.S. at 350, 78 S.Ct. at 318):

"It should be unnecessary to say that we are not here dealing with the use of incompetent or illegal evidence in a trial on the merits, nor with the right to decline to give incriminating testimony in legal

proceedings or to suppress the direct or derivative use at the trial of evidence illegally obtained."

In United States v. Tane, 329 F.2d 848, 849 (2d Cir. 1964), our Court of Appeals has pointed out that a defendant has no right to a dismissal of the indictment because "incompetent" evidence, which would certainly include illegally seized evidence, was presented to the grand jury; whether to dismiss or not is in any event discretionary.

In a more recent case, our Court of Appeals found illegal searches and seizures so flagrant as to lead Chief Judge Lumbard to excoriate the officers responsible. United States v. D'Angiolillo, 340 F.2d 453 (2d Cir. 1965). The Court nevertheless said (340 F.2d at 456):

"We do not believe, however, that dismissal of the indictments would be an appropriate sanction * *. The law calls only for exclusion, and we do not think that the public interest would be served by requiring more than this in the exercise of our supervisory power over the administration of criminal justice."

See also United States v. Grosso, 225 F. Supp. 161, 175 (W.D.Pa.1964) ("the use of such illegally obtained evidence is irrelevant where the issue facing the Court is whether * * * an indictment should be dismissed."); United States v. Block, 202 F.Supp. 705, 707 (S.D.N.Y. 1962) ("The motion to suppress the evidence is granted. The motion to dismiss the indictment is denied, because the court cannot speculate upon the nature and quality of the evidence presented to the grand jury.").

The motion of defendant Birrell to suppress for use as evidence the property seized on August 22 and 24, 1959 is hereby granted.

The motion of defendant Birrell for a hearing to take evidence on the motion to suppress and the motion of defendant Birrell for an order directing the United States Attorney to produce, etc. are hereby denied.

The Court will hear the parties in Room 506 at 2 o'clock in the afternoon of Monday, June 21, 1965, on the question whether there is any reason why the seized property, or any part thereof, should not be returned to Birrell.

The Court will receive evidence at the same time and place as to the facts and circumstances relating to the taking into possession by the District Attorney of New York County on July 24, 1959 of certain records from the premises on Sugar Bottom Road, and relating to the subsequent custody of those records.

The motion of defendant Birrell to dismiss the indictments is denied. The motion of defendant Birrell for an order granting him inspection of the grand jury minutes is likewise denied.

So ordered.