**UNITED STATES of America, Plaintiff,**

v.

**Charles Winfield WEST, Defendant.**

**Crim. A. No. 2120.**

United States District Court, D. Delaware.

April 16, 1971.

Supplemental Opinion June 4, 1971.

· ·John Abramo, Asst. U.. S. Atty., Wilmington, Del., for plaintiff.

Karl Haller, Tunnell & Raysor, Georgetown, Del., for defendant.

## MEMORANDUM

STAPLETON, District Judge.

■ The original indictment of October 27, 1970, charges Charles West with possession of an unregistered sawed-off shotgun on or about June 26, 1970, in Georgetown, Delaware. After the arraignment, defendant West moved to suppress a sawed-off shotgun in possession of the government and also a statement of his dated July 20, 1970. At the commencement of the hearing on this motion, the defendant took the position that since the "offense of possession of a sawed-off shotgun is consummate on admission of possession of the same, defendant need not allege standing to suppress as such allegation would necessarily be of an incriminating nature". I ruled that the crime here charged was like that charged in Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed. 2d 697 (1960), rather than that charged in United States v. Konigsberg, 336 F.2d 844 (3 Cir. 1964), and that, under the rule of the *Jones* case, the defendant could rely upon the indictment's charge of possession on or about June 26, 1970 to establish his standing to object to any illegal search and seizure which may have taken place on or about that date.

The only witness called by the defendant was Mr. Wilson Trott. He testified to the following facts, which were not rebutted by the government and which I find to be true. Sometime during the latter part of June, 1970, Chief Todd, a law enforcement officer of the town of Georgetown, Delaware, and two federal treasury agents had a conversation with Mr. Trott and Mr. Douglas Cannon in an automobile. At that time, Chief Todd told Trott and Cannon that he knew Charles West had a sawed-off shotgun and that he, Todd, wanted that gun. He told Trott and Cannon that they must find the gun for him, that he would give them one week to find it, and that if they didn't have the gun by the end of that time, he would put them in jail until the gun was found.

As a result of this threat of imprisonment, Trott and Cannon began to search for the gun. Among other things, they inquired of others about the location of the gun. On or about the third day after the conversation with Chief Todd, they decided to search Trott's car in an effort to find the gun. In the course of searching Trott's car, they found a sawed-off shotgun wedged in between the springs of the front seat. Immediately after finding the gun they delivered it to the authorities. Trott and Cannon conducted their search because they were afraid they would be arrested if they did not find the gun.

Trott's testimony revealed that West was not present at the time the gun was found and, indeed, was incarcerated at that time. The only things which tied defendant West to the shotgun on the date of the search were (1) the allegation of the indictment that he possessed it on or about that date, (2) Trott's testimony that Chief Todd claimed West owned the shotgun and (3) Trott's testimony that Cannon told him it was West's shotgun.

After the close of the hearing, the government secured another indictment charging West with possession of a sawed-off shotgun on or about June 5, 1970, and, by stipulation, this indictment was substituted for the original one.

Defendant has relied upon the constitutional prohibition against unreasonable searches and seizures only by way of

analogy. He asserts that Chief Todd's threat was "illegal" and that, accordingly, this Court must suppress the evidence obtained as a result of that threat or give approval to illegal police conduct. Defendant thus concludes that the gun must be suppressed without regard to whether there was a search and seizure which violated the Fourth or Fourteenth Amendments.

It seems to me that the shotgun should either be suppressed as the fruit of an illegal search and seizure or not suppressed at all. I cannot accept defendant's argument of a taint by virtue of the threat alone. While defendant asserts repeatedly that Sheriff Todd's conduct was "illegal", he has not directed me to any authority which I think supports that proposition and I have found none. Under the circumstances of this case, I do not think the threat of imprisonment was even tortious conduct. Moreover, if the threat had been "illegal", in a sense which would have required suppression of evidence in a proceeding against Trott, this would not mean that the treat would provide a basis for suppression as to West unless the threat resulted in some subsequent activity which violated West's own rights. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1962).

■ My conclusion that Chief Todd's threat was not "illegal" does not end the matter, however. His threat, whether legal or illegal, did in fact result in a search of Trott's car and a seizure of property found therein. While the Fourth Amendment does not apply to searches and seizures by private individuals, a law enforcement officer cannot circumvent the requirement of a search warrant merely by using a private citizen to do his searching for him. See *e. g.*, Purvis v. Wiseman, 298 F.Supp. 761 (D.C.Or.1969); Moody v. United States, 163 A.2d 337 (D.C.Mun.App.1960). If, for example, Chief Todd had directed Trott at gunpoint to search Trott's car at a time when Chief Todd could not have searched the car himself without violating the Fourteenth Amend-

ment, the gun would, of course, have to be suppressed. Concededly, the case here is somewhat different. I think it probable, and I have assumed for the purpose of this motion, that Chief Todd's threat was motivated by a conviction that the most important thing was to get the shotgun out of circulation as fast as possible and that when he made the threat, he did not have a specific search of private property in mind or any specific intent of violating anyone's constitutional rights. I think, however, that where a law enforcement officer compels a private citizen to "find" a specified article for him and does not specifically proscribe the search so as to confine it to legal searches, any unreasonable search and seizure of private property which in fact takes place as a result of the compulsion must be considered to be governmental action. To hold otherwise would provide too easy a detour around the constitutional barriers of the Fourth and Fourteenth Amendments.

■ The next question is whether Chief Todd himself could have legally searched Trott's car and seized the gun at the time when Trott in fact made this search and seizure. The answer is negative. Chief Todd had no warrant authorizing the search of Trott's vehicle and any search by him would not have been incident to a legal arrest or under such "exceptional circumstances" as will sometimes justify a search without a warrant. And, finally, there is no evidence of voluntary consent by Trott. Indeed, the search occurred only because of his fear of detention if he did not do Chief Todd's bidding.

The final question is whether defendant West was a "person aggrieved by the unlawful search and seizure" within the meaning of Rule 41(e). Defendant relies solely on Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) to establish his standing under that rule. At the time of the hearing, defendant's reliance upon the *Jones* case was well founded. The government had alleged that he had possession on or

about the date of the search and a jury could not have found him guilty as charged without believing that he had possession on or about the date of the search. The Supreme Court in the *Jones* case found it unconscionable under such circumstances to allow the government to resist a suppression motion on the grounds that the defendant lacked standing. I also agree with the defendant's contention that it was the *Jones* case rather than United States v. Konigsberg, 336 F.2d 844 (3 Cir. 1964), which governed this case as it existed at the date of the hearing.

The problem is that as a result of the evidence produced at the hearing, the government has secured a new indictment charging defendant West with possession of an unregistered shotgun on or about June 5, 1970. This seems to me to render the *Jones* case inapplicable. There is no inconsistency between an allegation that defendant had possession of the gun on or about June 5, 1970 and a contention that he had no possessory or proprietary interest in the gun at the time of the search and seizure in late June. West's situation is now like that of the appellant in United States v. Cowan, 396 F.2d 83 (2 Cir. 1968) who was charged with possession of baggage and clothing stolen from common carriers in interstate commerce. The court described and analyzed appellant's contention as follows:

" * * * Appellant contends that because possession of the baggage would be sufficient for conviction under 18 U.S.C. § 659, United States v. Minieri, 303 F.2d 550 (2d Cir.) cert. denied, 371 U.S. 847, 83 S.Ct. 79, 9 L.Ed.2d 81 (1962), he is automatically entitled to standing to object to its search and seizure. We do not read the *Jones* case quite so broadly. In *Jones*, the conviction flowed from possession at the time of the search, while in this case the hotel had possession at the time of the search and the conviction flows from appellant's possession at an earlier time. Possession on or about March 23, as charged in the indictment, does not give appellant standing to challenge a search on March 29 when the baggage was concededly in the possession of the hotel manager pursuant to the hotel's lien. N. Y. Lien Law, § 181 (McKinney's Consol. Laws, c. 33, 1966), Roth v. Hotel Riverside Plaza, Inc., 188 Misc. 180, 67 N.Y.S.2d 518 (1st Dept.1947). Unlike Jones, Cowan was not charged in the indictment with possession or the right to possession at the time of the search and the subsequent seizure. See United States v. Bozza, 365 F.2d 206, 222–223 (2d Cir. 1966)."

■ Chief Todd's search in this case was clearly directed at defendant West and no one else. See Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed. 2d 697 (1960). Moreover, the record indicates, though solely through testimony which is probably inadmissible hearsay, that defendant West owned the gun on the date of the search. If this be the case, I would conclude that he was a party aggrieved by the search of Trott's car and the seizure of the weapon. As I read the cases, where a person has a proprietary interest in the thing seized at the time of the search and seizure, he has standing to insist upon suppression even though he had no possessory or proprietary interest in the area searched, was not present at the time of the search, and had placed the seized property on the searched premises without the permission or even knowledge of the person or persons in possession of the premises searched. Simmons v. United States, 390 U.S. 377, 391, 88 S.Ct. 967, 19 L.Ed. 2d 1247 (1967); United States v. Wolfson, 299 F.Supp. 1246 (D. Del. 1969).

■■ Since West has been reindicted in a manner which renders the *Jones* case inapplicable and since the record indicates he may be able to establish standing independent of that case, I have concluded that West should be permitted the opportunity to supplement the record of the hearing on his motion to suppress in order to establish his proprietary interest in the things seized. If defendant West supplements the record by testify-

ing himself, that testimony may not be used against him at trial under the doctrine of Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1967). If defense counsel wishes to argue that the present record supports standing without reference to the *Jones* case, I will hear him at the pre-trial conference and, at the same time, will hear any supplemental testimony tendered.

Finally, the portion of defendant's motion pertaining to the written statement of June 20, 1970, must be denied. There is nothing whatever in the record from which I could conclude that this statement exists, much less that it was the product of the search and seizure. Indeed, the impression given by the testimony was that the search occurred after June 20, 1970, and, accordingly, that any statement dated that day would have come before the search.

## SUPPLEMENTAL MEMORANDUM

At the supplementary suppression hearing held at my direction pursuant to my opinion of April 16, 1971, 328 F. Supp. 545, evidence of the following facts was introduced and unrebutted. I find these facts to be true.

Defendant West was arrested at approximately 12:30 P.M. on June 5, 1970, at his place of employment. His person and his locker were searched and nothing was found. He was taken to a Justice of and Peace and committed, presumably in default of bail. He was taken to the Sussex County Correctional Institution in Georgetown, Delaware. From approximately 12.30 P.M. on June 5, 1970, until December 17, 1970, West was in the custody of the authorities.

On June 6, 1970, West was interviewed by Chief Todd at the Georgetown Police Station. Todd said he knew West had a shotgun and asked him where it was. West said it was at the house where he had been staying. They then proceeded to the house but the gun was not there. The door of the house showed signs of a forced entry. West made his statement to Chief Todd voluntarily.

On or about June 26, 1970, the sawed-off shotgun referred to in the indictment came into the possession of the authorities under the circumstances described in my Memorandum of April 16, 1971.

On July 20, 1970, West was being held in the New Castle County Correctional Institution. Two treasury agents came to interview him there. They gave him a waiver sheet containing a statement of his constitutional rights and a waiver thereof. He understood his rights and voluntarily signed the waiver sheet. The agents told him that they had found a shotgun and had it outside. They did not have it physically at the interview because they were not permitted to bring it into the prison. West signed a written statement as a result of the interview.

Among other things, the statement reveals that West bought a sawed-off shotgun in the early spring of 1970 from an unknown negro male whose car had a Maryland tag. The statement continues:

"That gun was about 30" long, full stock, single barrel, and rusty. It sounds like the one you describe. I had scratched on the stock 'Must I go to Jesus'. I knew it could be against the law to have a sawed-off gun if the gun was under 18". I had heard this against the federal law. (sic.) As this gun was right long I thought it was ok."

West had been staying at Jack Gibbs' house and left the gun there. He left as a result of a quarrel. His statement continues:

"In June, the Georgetown police asked me about the gun and I took them to Jack's house to turn over the gun. We found the window glass broken and the door broken and the gun missing. That is all I know of the matter."

Following the second hearing, I asked the parties to further brief and argue the standing question. In the briefing and

at argument, the government urged me to reconsider the conclusions of law I had reached in my Memorandum of April 16, 1971.

The defendant urges that his standing to challenge the seizure of the gun is established by Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Alternatively, he asserts that if the *Jones* case does not, in itself, establish his standing, the holding of the *Jones* case that the government is estopped to deny an allegation of possession in an indictment (in this case possession by West on June 5, 1970) together with the defendant's testimony that he did not sell, transfer or give away any firearm during the months of June and July of 1970 establish his standing to attack the search of June 26, 1970.

The government reasserts its position that under the *Jones* case, one must have an interest in the premises searched or be present on the premises at the time of the search in order to have standing. It also relies upon the fact that the gun mentioned in the indictment and currently in the possession of the government does not have an inscription on the stock and the fact that West testified at the hearing that he had never possessed the gun referred to in the indictment. Finally, the government asserts that even if its contention that there was only one gun and that West possessed the gun referred to in the indictment on or about June 5, 1971 be accepted as fact, the evidence affirmatively demonstrated that West had neither actual nor constructive possession at the time of the June 26 search.

■ I have re-examined the conclusions reached in my Memorandum of April 16, 1971. I reaffirm the views expressed therein, including the view that under the *Jones* case, the government's allegation that the defendant possessed the gun referred to in the indictment on June 5 does not, by itself, establish the defendant's standing to attack a search and seizure which occurred on June 26th. In my view, the *Jones* case does dictate, however, that for the purposes of deciding the question of standing, I must hold the government to its version of the facts upon the merits.[1] Thus, for present purposes, I accept the government's contention that the gun referred to in Mr. West's oral statement to Chief Todd and his written statement to the treasury agents is the gun which is referred to in the indictment and which is presently in the possession of the government.

When viewed from this prospective, I believe the question before me is governed by United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951) and Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1967). The Supreme Court of the United States in the *Jeffers* case held that "the Fourth Amendment prohibits both unreasonable searches and unreasonable seizures and its protection extends to both 'houses' and 'effects'." 342 U.S. at 51, 72 S.Ct. at 95. As a result, one has standing to complain when property in which one has a proprietary or possessory interest is seized on the premises of another in the course of an illegal search whether or not one is on those premises at the time of the search.

---

1. It is true that the government's position in this case with respect to the standing question and with respect to the merits are not as "squarely contradictory" as those of the government in the *Jones* case. As I have previously observed, the possession which would here convict (i.e., possession on June 5th) is not the same possession which would confer standing (i.e., possession on June 26th). There is, however, a contradiction between the facts upon which the government will rely to es-

tablish the critical fact of possession on June 5th and the government's assertion of a lack of standing on June 26th. In the words of Justice Frankfurter, I do not think it would be "consonant with the amenities, to put it mildly, of the administration of criminal justice to sanction such squarely contradictory assertions of power by the Government." Jones v. United States, 362 U.S. 257, 263–4, 265, 80 S.Ct. 725, 4 L.Ed.2d 697 (1959).

In the *Jeffers* case, the police had conducted a warrantless and illegal search of the hotel room of defendant's two aunts. Defendant was convicted on the basis of narcotics found in the closet of the apartment. The aunts had not given him permission to store the narcotics there and had no knowledge that any were so stored. The defendant was not present at the time of the search. In addition to the conclusion of the court quoted above, the following observations are applicable here if one substitutes the words "sawed-off shotgun" for the word "narcotics":

"The Government argues, however, that the search did not invade respondent's privacy and that he, therefore, lacked the necessary standing to suppress the evidence seized. The significant act, it says, is the seizure of the goods of the respondent without a warrant. We do not believe the events are so easily isolable. Rather they are bound together by one sole purpose— to locate and seize the narcotics of the respondent. The search and seizure are, therefore, incapable of being untied. To hold that this search and seizure were lawful as to the respondent would permit a quibbling distinction to overturn a principle which was designed to protect a fundamental right. The respondent unquestionably had standing to object to the seizure made without warrant or arrest unless the contraband nature of the narcotics seized precluded his assertion, for purposes of the exclusionary rule, of a property interest therein." 342 U.S. at 52, 72 S.Ct. at 95.

The court went on to hold that the congressional declaration that "no property rights shall exist" in contraband drugs was "merely intended to aid in their forfeiture and thereby prevent the spread of the traffic in drugs rather than to abolish the exclusionary rule formulated by the courts in furtherance of the high purposes of the Fourth Amendment."

The *Jones* case did not, in my judgment, affect the holding in the *Jeffers* case. The *Jones* case held (1) that in cases where a possessory crime of the kind there involved is charged, the government is estopped to deny the allegations of possession contained in the indictment when contesting the defendant's standing to move for suppression and (2) that anyone lawfully on the premises at the time of an illegal search and seizure has standing to object thereto. The second holding expanded the rule dealing with the relationship one must have to the *premises searched* in order to have standing. In so holding, however, the court did not purport to provide an exclusive enumeration of the interests which would confer standing. Specifically, it did not deny that one may have standing based upon a proprietary or possessory interest in the *thing seized*.[2]

My reading of the *Jones* case is confirmed by the court's observations in the *Simmons* case. The *Simmons* case involved facts similar to those in the *Jeffers* case. The defendant, Garrett, had no interest in the premises searched and was not present at the time of the search. The court stated:

" * * * Garrett evidently was not in Mrs. Mahon's house at the time his suitcase was seized from her basement. *The only, or at least the most natural, way in which he could found*

---

**2.** Indeed, the court in the *Jones* case recognized the general rule that standing may be established by a proprietary or possessory interest in the *thing seized*, as well as by a connection with the premises searched. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L. Ed.2d 441 (1962) is not, as the government urges, inconsistent with this reading of *Jones*. Wong Sun was held not to have standing to raise the question of an illegal search and seizure of narcotics. It affirmatively appeared in that case, however, that Wong Sun not only had no interest in the premises searched but also that he had no proprietary or possessory interest in the narcotics seized at the time they were seized. Prior to the time that they were seized they had either been sold or given to another by Wong Sun.

*standing to object to the admission of the suitcase was to testify that he was its owner.*[13]   Thus, his testimony is

13.   The record shows that Mrs. Mahon, the owner of the premises from which the suitcase was taken, disclaimed all knowledge of its presence there and of it ownership."

to be regarded as an integral part of his Fourth Amendment exclusion claim. * * * (emphasis supplied).

Under the government's version of the facts in this case, West had a proprietary and possessory interest in the shotgun referred to in the indictment on or about June 5, 1970. I find as a fact that he did not transfer any interest in a firearm between June 5 and June 26. The only remaining question, therefore, is whether its apparent removal by someone else prior to mid-day on June 6, 1970, if accepted as fact, would deprive West of standing to attack the June 26th search and seizure.[3]

■   I agree with the government's contention that if West did not know where the gun was on June 26, he cannot be said to have had possession or constructive possession on that date. While I have found no case which has considered a similar situation, I do not think any lack of actual or constructive possession determines the matter, however. If the gun was removed without West's knowledge or consent, he nevertheless retained his ownership and right to possession. To be sure, his right "to be secure in [his] * * * effects" would have been violated first by the thief and not by the government. When the gun was subsequently seized in the course of an illegal search, however, that right was further infringed by the government. The rationale of the *Jeffers* case seems equally applicable whether or not there was a theft. Accordingly, it seems to me that West was a "person

aggrieved" by the unlawful search and unlawful seizure within the meaning of Rule 41(e) and has standing to raise the constitutional question. Putting this conclusion on the standing question together with the holding in my previous Memorandum that the search was an illegal one which must be attributed to the government, it follows that the motion to suppress the sawed-off shotgun currently in the government's possession must be granted.

■   West's motion to suppress was broad enough to cover his oral and written statements as well as the sawed-off shotgun. At least until the close of the second hearing, the only ground asserted in support of this portion of the motion was that the written statement was produced by the illegally seized shotgun and was, accordingly, "fruit of the poisonous tree". At the close of the second hearing it was suggested that there might be a Miranda problem present in this case. While none of the evidence introduced at the suppression hearing indicates that this is so, I agree with defense counsel that the government has the burden of showing that appropriate warnings were given prior to West's oral and written statements. Under the circumstances of this case, however, I do not think it would be fair to suppress the statements on the theory that there has been a failure of proof. The government did produce a written waiver of constitutional rights signed by West at the time of the written statement and it had no reason to believe that the prior oral statement was being challenged on Miranda grounds prior to defense counsel's closing argument. If the defense has any reason to believe that Miranda warnings were not given, it may object when the statements are offered at trial and the government, in voir dire, will be

3.   I do not find as a fact on the basis of the current record that the gun was stolen. I reach this final question only because the government asserts that, on the basis of West's own testimony, any standing which he might have had on June 5th disappeared if there was a theft. If

there was no theft and West placed the gun in Trott's car, West had constructive possession of the gun on June 26th, United States v. Birrell, 242 F.Supp. 191 (S.D.N.Y.1965), and the case, in any event, would be on "all fours" with the *Jeffers* case.

**554**

required to demonstrate that they were in fact given.

 With respect to the intention that the written statement was a result of the illegal seizure, I find as a matter of fact that it was not. I base this finding primarily on the fact that West had given substantially the same statement orally to Chief Todd prior to the seizure. It is clear to me that the written statement had an "independent source" and was not "fruit of the poisonous tree". United States v. Carney, D. C., 328 F.Supp. 948 (Opinion of May 21, 1971).

Submit order.